Timothy S. WILLBANKS, Appellant,

v.

Missouri DEPARTMENT
OF CORRECTIONS,
Respondent.

No. SC 95395

Supreme Court of Missouri,
en banc.

Opinion issued July 11, 2017

---

Willbanks was represented by Craig A. Johnston of the public defender's office in Columbia, (573) 777-9977.

The department was represented by Michael J. Spillane of the attorney general's office in Jefferson City, (573) 751-3321.

Mary R. Russell, Judge

Timothy S. Willbanks was 17 years old when he was charged with kidnapping, first-degree assault, two counts of first-degree robbery, and three counts of armed criminal action. He was convicted and sentenced to consecutive prison terms of 15 years for the kidnapping count, life for the assault count, 20 years for each of the two robbery counts, and 100 years for each of the three armed criminal action counts. On appeal, he argues his sentences, in the aggregate, will result in the functional equivalent of a life without parole sentence. He contends Missouri's mandatory minimum parole statutes and regulations violate his right to be free from cruel and unusual punishment as protected under the Eighth Amendment to the United States Constitution in light of *Graham v. Florida*, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010).

This Court holds that Missouri's mandatory minimum parole statutes and regulations are constitutionally valid under the Supreme Court of the United States's opinion in *Graham*. *Graham* held that the

Eighth Amendment barred sentencing a juvenile to a **single** sentence of life without parole for a nonhomicide offense. Because *Graham* did not address juveniles who were convicted of **multiple** nonhomicide offenses and received multiple fixed-term sentences, as Willbanks had, *Graham* is not controlling. The trial court's judgment is affirmed.[1]

## Factual and Procedural Background

Willbanks was 17 years old when he devised a plan with two other individuals to steal a car. Carrying a sawed-off shotgun, Willbanks approached a woman in the parking lot of her apartment building. After ordering her to get in the driver's seat of her car, he climbed in the back seat and directed her to drive to an ATM, where he took all the money from her account. When the victim failed to follow Willbanks's driving instructions, he became angry, ordered her to stop the car, and forced her into the trunk.

Willbanks drove to a different location. Once he released the victim from the trunk, he took her jewelry and other belongings. Willbanks told his accomplices, who had followed in a separate car, that he wanted to shoot the victim, but they told him to leave her alone. At Willbanks's direction, the victim began to walk away from them, and as she did, Willbanks shot her four times. Willbanks and his accomplices then left her and drove away. The victim crawled for 40 minutes to get help despite injuries to her right arm, shoulder, back, and head. The victim survived the ordeal, but she was left with permanent disfigurement and irreparable injuries.

After the victim picked Willbanks out of a photograph lineup, the police arrested him and his accomplices, and all three gave consistent confessions. A jury convicted Willbanks of one count of kidnapping, one count of first-degree assault, two counts of first-degree robbery, and three counts of armed criminal action. The trial court imposed prison sentences of 15 years for kidnapping, life imprisonment for first-degree assault, 20 years for each robbery count, and 100 years for each armed criminal action count, and set these terms to run consecutively.

Willbanks's convictions and sentences were affirmed on direct appeal, *State v. Willbanks*, 75 S.W.3d 333 (Mo. App. 2002), and his motion for postconviction relief was overruled. *Willbanks v. State*, 167 S.W.3d 789 (Mo. App. 2005). He then filed a petition for a writ of habeas corpus in the Cole County Circuit Court, arguing his aggregated sentences amounted to the functional equivalent of a life without parole sentence and violated his Eighth Amendment rights under *Graham*. The trial court denied the petition, indicating the proper avenue for the relief Willbanks sought was through a declaratory judgment action.

Accordingly, Willbanks filed another petition, in which he requested a judgment declaring that section 558.019.3[2] and 14 CSR 80-2.010, which require offenders to serve specific percentages of their sentences before they become parole-eligible, are unconstitutional as applied to him. He alleged, under the current Missouri parole statutes and regulations, he does not have a meaningful opportunity to obtain release because he does not become parole eligible

---

1. This opinion is limited to cases involving aggregated multiple fixed-term sentences imposed for **multiple** offenses and does not address cases involving a fixed-term sentence imposed for a **single** criminal act.

2. All statutory references are to RSMo Supp. 2013 unless otherwise indicated.

until he is approximately 85 years old. Willbanks requested a hearing to present evidence in support of these allegations.

The Department of Corrections ("DOC") answered the petition and sought judgment on the pleadings. The trial court sustained DOC's motion, finding Willbanks's case was distinguishable from *Graham* because *Graham* involved a **single** sentence of life without parole for one offense and Willbanks was convicted of **seven** separate felonies and received seven consecutive sentences as a result. Willbanks appeals.[3]

### Standard of Review

■ The constitutional validity of a statute is a question of law, which this Court reviews *de novo. State v. Honeycutt*, 421 S.W.3d 410, 414 (Mo. banc 2013). A statute is presumed to be valid and will not be held unconstitutional absent a clear contravention of a constitutional provision. *Id.*

### Legal Background

■ The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment. When reviewing whether a punishment is cruel and unusual, "courts must look beyond historical conceptions to the evolving standards of decency that mark the progress of a maturing society." *Graham*, 560 U.S. at 58, 130 S.Ct. 2011 (citations and quotation marks omitted).

In the last decade, the Supreme Court has issued a series of opinions concerning the constitutional validity of punishments for offenders who were younger than 18 years of age at the time they committed crimes. In *Roper v. Simmons*, 543 U.S. 551, 578, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), the Supreme Court affirmed a holding from this Court that the Eighth and Fourteenth Amendments barred the execution of juvenile offenders. Five years later in *Graham*, the Supreme Court held that the Eighth Amendment barred courts from sentencing juvenile nonhomicide offenders to life without parole. 560 U.S. at 75, 130 S.Ct. 2011. *Graham* was expanded to prohibit homicide juvenile offenders from being subject to a mandatory sentence of life without parole in *Miller v. Alabama*, 567 U.S. 460, 132 S.Ct. 2455, 2464, 183 L.Ed.2d 407 (2012). Most recently, the Supreme Court ruled in *Montgomery v. Louisiana*, —— U.S. ——, 136 S.Ct. 718, 732, 193 L.Ed.2d 599 (2016), that *Miller'* s new substantive rule must be applied retroactively on collateral review for juvenile offenders sentenced to mandatory life without parole.

### Analysis

■ Willbanks argues Missouri's statutes and regulations requiring offenders to serve a percentage of their total sentence before being eligible for parole are unconstitutional when applied to him as he is denied parole eligibility until past his natural life expectancy.[4] According to Will-

---

3. This Court has jurisdiction pursuant to article V, section 10 of the Missouri Constitution.

4. Under section 558.019.3, offenders guilty of a dangerous felony—including kidnapping, first-degree assault, and first-degree robbery—become eligible for parole when they have served 85 percent of their sentence or when they have reached the age of 70, provided they have served 40 percent of their sentence, whichever occurs first. Under 14 CSR 80-2.010(1)(E), offenders guilty of other crimes who are sentenced to 45 years or more become eligible for parole when they have served 15 years. Because Willbanks would be eligible for parole at age 70 for his dangerous felonies plus 15 years for armed criminal action, he will be eligible for parole at approximately age 85. Willbanks's statistical life expectancy, according to the Centers for Disease Control and Prevention, is 79 years.

banks, pursuant to Missouri's parole statutes and regulations, his aggregated sentences for **seven** nonhomicide offenses prevent him from having a "meaningful opportunity to obtain release" as required by *Graham*. 560 U.S. at 75, 130 S.Ct. 2011.

■ Willbanks's argument is misplaced as *Graham* concerned "juvenile offenders sentenced to life without parole solely for **a** nonhomicide offense." *Id.* at 63, 130 S.Ct. 2011 (emphasis added). In *Graham*, the juvenile offender was convicted of two nonhomicide crimes, armed burglary and attempted armed robbery, and was sentenced to life imprisonment and 15 years for each respective charge.[5] *Id.* at 57, 130 S.Ct. 2011. The Supreme Court held that the Eighth Amendment prohibits juvenile nonhomicide offenders from being sentenced to life without parole. *Id.* at 82, 130 S.Ct. 2011. Importantly, "[a] State need not guarantee the offender eventual release, **but if it imposes a sentence of life** it must provide him or her with some realistic opportunity to obtain release before the end of that term." *Id.* (emphasis added).

*Graham's* facts involved (1) a juvenile offender (2) who committed a nonhomicide crime and (3) was sentenced to life without parole. Although Willbanks was younger than 18 years old at the time he committed his nonhomicide crimes, he was not sentenced to life without parole. His argument is *Graham* applies to him as he was convicted of multiple crimes and sentenced to multiple fixed-term periods that, in the aggregate, total more than his life expectancy. Willbanks contends, under Missouri's mandatory minimum parole statutes and regulations, his life sentence plus multiple fixed-year terms are the "functional equivalent of life without parole"

because they prevent him from being eligible for parole until he is approximately 85 years old.

■ Whether multiple fixed-term sentences, which total beyond a juvenile offender's life expectancy, should be considered the functional equivalent of life without parole is a question of first impression for this Court. *Graham* prohibits a life without parole sentence because it

guarantees he will die in prison without any meaningful opportunity to obtain release, no matter what he might do to demonstrate that the bad acts he committed as a teenager are not representative of his true character, even if he spends the next half century attempting to atone for his crimes and learn from his mistakes.

*Id.* at 79, 130 S.Ct. 2011.

■ Requiring inmates to serve a mandatory minimum percent of their sentence is not inherently unconstitutional. *See, e.g.*, *State v. Pribble*, 285 S.W.3d 310, 314 (Mo. banc 2009) (holding that a five-year mandatory minimum parole ineligibility period does not "run[ ] afoul of cruel and unusual punishment"). But the Supreme Court has advised states are prohibited by the Eighth Amendment "from making the judgment at the outset that those offenders never will be fit to reenter society." *Graham*, 560 U.S. at 75, 130 S.Ct. 2011. Yet *Graham* did not address juvenile offenders who, like Willbanks, were sentenced to multiple fixed-term periods of imprisonment for **multiple** nonhomicide offenses. Instead, *Graham* concerned juvenile offenders who were sentenced to life without parole for a **single** nonhomicide offense. *Id.* at 63, 130 S.Ct. 2011.

**5.** Absent gubernatorial clemency, Graham had no possibility of parole as the Florida parole system had been abolished. *Graham*, 560 U.S. at 57, 130 S.Ct. 2011.

In *Graham*, the Supreme Court examined federal and state sentencing laws to see how many jurisdictions permitted juvenile nonhomicide offenders to receive life without parole and how many jurisdictions prohibited such punishments. *Id.* at 62, 130 S.Ct. 2011. It also looked at the actual number of juvenile offenders serving life without parole sentences, which totaled only 123 nationwide. *Id.* at 64, 130 S.Ct. 2011. Obviously, the number of juveniles with multiple fixed-term sentences would number in the thousands. At no point did the Supreme Court consider a juvenile offender sentenced to multiple fixed-term periods and whether such terms, in the aggregate, were equal to life without parole. In fact, Justice Alito noted in his dissent, **"Nothing in the [Supreme Court's] opinion affects the imposition of a sentence to a term of years without the possibility of parole."** *Id.* at 124, 130 S.Ct. 2011 (Alito, J., dissenting) (emphasis added). Justice Thomas also pointed out in his dissent, joined by Justices Scalia and Alito, that **"it seems odd that the [Supreme Court] counts only those juveniles sentenced to life without parole and excludes from its analysis all juveniles sentenced to lengthy term-of-years sentences (e.g., 70 or 80 years' imprisonment)."** *Id.* at 113 n.11, 130 S.Ct. 2011 (Thomas, J., dissenting) (emphasis added).

Although *Graham* found, "[w]ith respect to *life without parole* for juvenile nonhomicide offenders, none of the goals of penal sanctions that have been recognized as legitimate—retribution, deterrence, incapacitation, and rehabilitation—provides an adequate justification," *id.* at 71, 130 S.Ct. 2011 (majority opinion) (emphasis added) (citation omitted), Willbanks and the dissent have failed to show these penological goals are not served by sentencing juveniles to multiple fixed-term sentences. The effect of an offender's age on these penological concerns is better suited for the General Assembly than this Court.

■■■■■ The dissent does not fully explain the differences it perceives in the pursuit of penological goals when sentencing juvenile nonhomicide offenders to multiple fixed-term sentences as compared with sentencing adults. Nor does the dissent explain why the trial court should be stripped of its authority to decide a juvenile's sentence for multiple nonhomicide offenses that, according to Missouri's sentencing statutes, may justify lengthy consecutive terms of imprisonment. The sentencer in a case (here, the trial court) has a duty to impose a sentence on a case-by-case basis. *State v. Collins*, 290 S.W.3d 736, 746 (Mo. App. 2009). Additionally, "[t]rial courts have very broad discretion in their sentencing function," *id.*, as evidenced in section 558.026.1, which provides that multiple prison terms shall run concurrently *"unless the court specifies that they shall run consecutively."* (Emphasis added). Neither this Court nor the Supreme Court has ruled on the constitutional impact of consecutive sentences. *See United States v. Aiello*, 864 F.2d 257, 265 (2d Cir. 1988).

The General Assembly recently enacted section 558.047, RSMo 2016, which allows juvenile offenders sentenced to life without parole to apply for parole after serving 25 years. Although the dissent argues this Court should apply this statute to cases in which juvenile offenders were sentenced to multiple fixed-term sentences, the General Assembly chose to limit the statute to those juvenile offenders sentenced to life without parole. This Court declines to extend the statute beyond its terms.

There is a split of authority among the United States Courts of Appeals regarding whether *Graham* applies when a juvenile nonhomicide offender is sentenced to terms of years rather than life without

parole. The Fifth Circuit says it does not apply. *United States v. Walton*, 537 Fed. Appx. 430, 437 (5th Cir. 2013).[6] The issue of whether the imposition of a sentence to a term of years totaling beyond a juvenile offender's life expectancy violates the Eighth Amendment was also addressed by the Sixth Circuit. In *Bunch v. Smith*, 685 F.3d 546 (6th Cir. 2012), the court held that a juvenile offender's multiple fixed-term sentences, totaling 89 years, did not violate the Eighth Amendment in light of *Graham. Id.* at 552. The Sixth Circuit acknowledged, "To be sure, [the juvenile offender's] 89-year aggregate sentence may end up being the functional equivalent of life without parole" as he will not be eligible for release until he is 95 years old. *Id.* at 551 & n.1.[7] The court noted, however, the Supreme Court in *Graham* addressed neither sentencing laws nor practices concerning juvenile nonhomicide offenders who were sentenced to multiple fixed-term periods. *Id.* at 552. The Sixth Circuit concluded, "This demonstrates that the [Supreme] Court did not even consider the constitutionality of such sentences, let alone clearly establish that they can violate the Eighth Amendment's prohibition on cruel and unusual punishments." *Id.*; *see Goins v. Smith*, 556 Fed.Appx. 434, 440 (6th Cir. 2014); *Starks v. Easterling*, 659 Fed.Appx. 277, 280 (6th Cir. 2016).

Seventeen other state supreme courts have considered this issue. Five of them have reached the same conclusion as this Court and held that *Graham* and *Miller* do not apply to prohibit multiple fixed-term sentences for juvenile offenders. *Lucero v. People*, 394 P.3d 1128, 1133 (Colo. 2017) ("Multiple sentences imposed for multiple offenses do not become a sentence of life without parole, even though they may result in a lengthy term of incarceration. Life without parole is a specific

6. The dissent here cites a Ninth Circuit case, *Moore v. Biter*, 725 F.3d 1184, 1192 (9th Cir. 2013), which held that sentencing a juvenile offender to 254 years' imprisonment went against *Graham* and violated the Eighth Amendment because the juvenile offender would not be eligible for parole until age 144. However, the Ninth Circuit also recently held that sentencing a juvenile offender to two consecutive 25-year terms with parole eligibility at age 66 did not violate the Eighth Amendment. *Demirdjian v. Gipson*, 832 F.3d 1060, 1076 (9th Cir. 2016). These holdings suggest the Ninth Circuit believes multiple aggregated sentences become the functional equivalent of life without parole at some point between when a juvenile offender turns 66 and 144 years old. Although the Ninth Circuit's opinions are not mandatory authority for this Court, the holding in this case is not inconsistent with the Ninth Circuit's decisions as Willbanks will be eligible for parole when he turns 85 years old. The same rationale applies to the recent case from the Tenth Circuit, which held that a juvenile offender's sentence was unconstitutional because he would not be eligible for parole until he had served 131.75 years in prison. *Budder v. Addison*, 851 F.3d 1047, 1059 (10th Cir. 2017). *See*

*also State v. Moore*, 149 Ohio St.3d 557, 582–83, 76 N.E.3d 1127, 2016 WL 7448751, at *22 (Ohio 2016) (holding that a juvenile offender's sentence was unconstitutional because he would not be eligible for parole until he was 92 years old).

7. Interestingly, *Bunch* and *Moore* concern the same incident. Chaz Bunch was 16 years old at the time of the incident and was sentenced to 89 years' imprisonment. *Bunch*, 685 F.3d at 547. Brandon Moore was 15 years old at the time of the incident and was sentenced to 112 years' imprisonment. *Moore*, 149 Ohio St.3d at 560, 76 N.E.3d 1127, 2016 WL 7448751, at *3. The Sixth Circuit held that Bunch's sentence did not violate the Eighth Amendment even though he would not be eligible for parole until age 95. *Bunch*, 685 F.3d at 552. However, the Ohio Supreme Court held that Moore's sentence did violate the Eighth Amendment because he would not be eligible for parole until age 92. *Moore*, 149 Ohio St.3d at 582–83, 76 N.E.3d 1127, 2016 WL 7448751, at *22. This discrepancy for the exact same factual situation further illustrates why this Court declines to extend *Graham* without direction from the Supreme Court.

sentence, imposed as punishment for a single crime, which remains distinct from aggregate term-of-years sentences resulting from multiple convictions."); *State v. Brown*, 118 So.3d 332, 342 (La. 2013); *State v. Ali*, 895 N.W.2d 237, 246 (Minn. 2017); *State v. Springer*, 856 N.W.2d 460, 470 (S.D. 2014), *cert. denied*, —— U.S. ——, 135 S.Ct. 1908, 191 L.Ed.2d 775 (2015); *Angel v. Commonwealth*, 281 Va. 248, 704 S.E.2d 386, 402 (2011). The remaining 12 state supreme courts that have considered this issue have held that, at *some point*, without uniform agreement as to when, aggregate sentences and parole ineligibility for juvenile offenders constitutes cruel and unusual punishment.[8]

The dissent mischaracterizes this Court's opinion as stating it lacks the power or authority to extend the Supreme Court's holding in *Graham*. Rather, this Court, absent guidance from the Supreme Court, should not arbitrarily pick *the point*

at which multiple aggregated sentences may become the functional equivalent of life without parole. The dissent argues such line drawing is "unavoidable," but "has not been an obstacle to the Supreme Court's recognition of categorical rules." Op. at 269 n.26. It points to *Graham*'s holding that created a categorical rule for offenders who were under the age of 18 at the time of their offense. This argument fails to address the fact that *Graham* itself concluded the age of 18 was an appropriate demarcation line for the imposition of life without parole because "18 is the point where society draws the line for many purposes between childhood and adulthood." *Graham*, 560 U.S. at 50, 130 S.Ct. 2011 (quoting *Roper*, 543 U.S. at 574, 125 S.Ct. 1183). There is no similar clear demarcation line at which point juvenile offenders' time in prison denies them meaningful opportunity to obtain release. As the Sixth Circuit opined in *Bunch*:

8. Two of the cases the dissent relies on reached their conclusions based on their own state constitutions rather than the federal constitution. In *State v. Null*, 836 N.W.2d 41, 70 & n.7 (Iowa 2013), the Supreme Court of Iowa "independently" applied the principles in *Miller* and *Graham* to a juvenile homicide offender's aggregate sentence. It held the sentence violated the Iowa Constitution's prohibition of cruel and unusual punishment rather than the Eighth Amendment to the United States Constitution because the juvenile offender would not be eligible for parole until age 69. *Id.* at 45, 70 n.7, 72 ("A decision of this court to depart from federal precedent arises from our independent and unfettered authority to interpret the Iowa Constitution."). In another case focused on by the dissent, *Brown v. State*, 10 N.E.3d 1, 8 (Ind. 2014), the Indiana Supreme Court relied on its own state constitution, as opposed to the Eighth Amendment, to reduce a juvenile's sentence. In *Brown*, a juvenile offender was sentenced to 150 years for homicide and robbery. *Id.* The Indiana Supreme Court commented a 150-year sentence is "[s]imilar to a life without parole sentence," but it did *not* hold such a sentence was a violation of the Eighth Amendment. *Id.* Rather, the court con-

cluded that a sentence of 150 years was "inappropriate" and used its discretion under the Indiana Constitution to revise the sentence to 80 years. *Id.* This reduction seems almost arbitrary as an 80-year sentence likely has the same psychological effect on a juvenile offender as a 150-year sentence. Regardless, the fact that 10 out of 50 states have reached similar conclusions as the dissent and found Eighth Amendment violations is not sufficient to establish a national consensus. *See People v. Caballero*, 55 Cal.4th 262, 145 Cal.Rptr.3d 286, 282 P.3d 291, 295 (2012); *Casiano v. Comm'r of Corr.*, 317 Conn. 52, 115 A.3d 1031, 1048 (2015), *cert. denied sub nom. Semple v. Casiano*, —— U.S. ——, 136 S.Ct. 1364, 194 L.Ed.2d 376 (2016); *Henry v. State*, 175 So.3d 675, 679-80 (Fla. 2015), *cert. denied*, —— U.S. ——, 136 S.Ct. 1455, 194 L.Ed.2d 552 (2016); *People v. Reyes*, 407 Ill.Dec. 452, 63 N.E.3d 884, 888 (2016); *Com. v. Brown*, 466 Mass. 676, 1 N.E.3d 259, 270 n.11 (2013); *State v. Boston*, 363 P.3d 453, 458-59 (Nev. 2015); *State v. Zuber*, 227 N.J. 422, 152 A.3d 197, 212 (2017); *Moore*, 149 Ohio St.3d at 582–83, 76 N.E.3d 1127, 2016 WL 7448751, at *22; *State v. Ramos*, 187 Wash.2d 420, 387 P.3d 650, 660-61 (2017);

At what number of years would the Eighth Amendment become implicated in the sentencing of a juvenile: twenty, thirty, forty, fifty, some lesser or greater number? Would gain time be taken into account? Could the number vary from offender to offender based on race, gender, socioeconomic class or other criteria? Does the number of crimes matter? There is language in the *Graham* majority opinion that suggests that no matter the number of offenses or victims or type of crime, a juvenile may not receive a sentence that will cause him to spend his entire life incarcerated without a chance for rehabilitation, in which case it would make no logical difference whether the sentence is "life" or 107 years. Without any tools to work with, however, we can only apply *Graham* as it is written.

*Bunch,* 685 F.3d at 552 (quoting *Henry v. State,* 82 So.3d 1084, 1089 (Fla. Dist. Ct. App. 2012), *decision quashed,* 175 So.3d 675 (Fla. 2015)). Likewise, this Court applies *Graham* as written and declines to extend its holding.

■ Over the last decade, the Supreme Court has stated that youth affects the penological considerations for the following: capital punishment, *Roper,* 543 U.S. at 571, 125 S.Ct. 1183; mandatory life without parole for homicide offenders, *Miller,* 132

S.Ct. at 2464; and life without parole for nonhomicide offenders, *Graham,* 560 U.S. at 75, 130 S.Ct. 2011. But the Supreme Court has not held that multiple fixed-term sentences totaling beyond a juvenile offender's life expectancy are the functional equivalent of life without parole. Warning of "frequent and disruptive reassessments of [the Supreme Court's] Eighth Amendment precedents," the Supreme Court has not looked positively upon lower courts issuing various rulings without precedence from the Supreme Court.[9] *Roper,* 543 U.S. at 594, 125 S.Ct. 1183 (O'Connor, J., dissenting). "[C]lear, predictable, and uniform constitutional standards are especially desirable" in the area of the Eighth Amendment. *Id.* Extending the Supreme Court's holdings beyond the four corners of its opinions is clearly disfavored.

The Supreme Court has never held that consecutive lengthy sentences for multiple crimes in excess of a juvenile's life expectancy is the functional equivalent of life without parole. The dissent acknowledges that its analysis is an extension of the law. Without direction from the Supreme Court to the contrary, this Court should continue to enforce its current mandatory minimum parole statutes and regulations by declining to extend *Graham.*

*Bear Cloud v. State,* 334 P.3d 132, 141-42 (Wyo. 2014).

9. As of the date of this opinion, the Supreme Court had not granted certiorari in any of the cases that have addressed this issue. The dissent takes issue with this Court's questioning of the appropriateness of extending *Graham'*s holding by pointing out the Supreme Court has not granted such review for any of the cases that have done what this Court declines to do. Op. at 240 n.2, 265–66 & n.23. According to the dissent, the Supreme Court has not found it necessary to correct the other courts that have reached the opposite conclusion as this Court has. *Id.* However, the Supreme Court has also not granted certiorari in any of

the cases that have reached the same conclusion as this Court. *See State v. Springer,* 856 N.W.2d 460, 470 (S.D. 2014), *cert. denied,* — U.S. —, 135 S.Ct. 1908, 191 L.Ed.2d 775 (2015). There are numerous factors appellate courts with discretionary review powers consider when deciding whether to review a lower court's decision, and it is inappropriate to extrapolate on a court's opinion when it denies review. The Supreme Court has repeatedly emphasized that "denial of certiorari does not constitute an expression of any opinion on the merits." *Boumediene v. Bush,* 549 U.S. 1328, 1329, 127 S.Ct. 1478, 167 L.Ed.2d 578 (2007) (Stevens and Kennedy, JJ., statement respecting denial of certiorari).

## Conclusion

The trial court did not err in finding Missouri's mandatory minimum parole statutes and regulations do not violate Willbanks's Eighth Amendment rights. The judgment is affirmed.

Fischer, C.J., Wilson and Powell, JJ., concur; Stith, J., dissents in separate opinion filed; Draper and Breckenridge, JJ., concur in opinion of Stith, J.

Laura Denvir Stith, Judge, dissenting.

I respectfully dissent. As the majority acknowledges, *Graham v. Florida*, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010), held that sentencing nonhomicide juvenile offenders to life without the possibility of parole (LWOP) categorically violates the Eighth Amendment because it offers juvenile offenders no meaningful opportunity for release. Sentencing juvenile offenders to an aggregate term of years that is so long they are likely to die in prison identically gives these juveniles no meaningful opportunity for release. For this reason, the Seventh, Ninth, and Tenth Circuits have held *Graham* must be applied to de facto LWOP aggregate sentences if they do not give the juvenile offender a meaningful opportunity for release. Twelve of the seventeen state supreme courts to decide the issue—including, just in the last few months, the supreme courts of Illinois, New Jersey, Ohio, and Washington—agree the imposition of lengthy aggregate sentences that are the functional equivalent of LWOP violates the juvenile's Eighth Amendment rights because the sentences do not allow a meaningful opportunity for release under the principles set out in *Graham* and *Miller v. Alabama*, 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012).[1]

1.  The federal cases include *Budder v. Addison*, 851 F.3d 1047 (10th Cir. 2017); *Moore v. Biter*, 725 F.3d 1184, 1194 (9th Cir. 2013); and *McKinley v. Butler*, 809 F.3d 908, 909 (7th Cir. 2016). The Sixth Circuit case relied on by the majority, *Bunch v. Smith*, 685 F.3d 546 (6th Cir. 2012), did not hold that state courts are not supposed to determine whether *Graham* applies to aggregate sentences until the Supreme Court does. It simply concluded that, under principles of federalism, as a *federal court*, it should not reverse the Ohio courts for refusing to apply *Graham* to aggregate sentences because the issue is not clearly settled. Since *Bunch* was decided, however, the Ohio Supreme Court has added its voice to the growing symphony of state court decisions holding *Graham* unequivocally *does bar* aggregate sentences that are the functional equivalent of LWOP in a case involving the same incident. *State v. Moore*, No. 2016-Ohio-8288, 149 Ohio St.3d 557, 76 N.E.3d 1127 (Ohio 2016). The Ohio court found it was improper to give aggregate sentences to the juvenile who acted with Bunch so he would not be released until age 92, because this would deny him a meaningful opportunity for release. *Id.* This is the ruling to which the Sixth Circuit would have to give deference were it deciding *Bunch* today, and which would result in holding Bunch's sentence violated *Graham* under Ohio law.

State cases finding aggregate LWOP sentences violate *Graham* include the four very recent cases of *State v. Ramos*, [187 Wash.2d 420] 387 P.3d 650, 660 (2017), *State v. Zuber*, [227 N.J. 422] 152 A.3d 197, 215-16 (2017), *Moore*, [149 Ohio St.3d at 584–87, 76 N.E.3d 1127] 2016 WL 7448751, at *23-24, and *People v. Reyes*, [407 Ill.Dec. 452] 63 N.E.3d 884, 888 (2016), as well as *People v. Caballero*, [55 Cal.4th 262, 145 Cal.Rptr.3d 286] 282 P.3d 291, 293 (2012), *State v. Riley*, [315 Conn. 637] 110 A.3d 1205 (2015), *cert. denied*, [— U.S. ——] 136 S.Ct. 1361 [194 L.Ed.2d 376] (2016), *Casiano v. Comm'r of Correction*, [317 Conn. 52] 115 A.3d 1031, 1043 (2015), *cert. denied sub nom. Semple v. Casiano*, [— U.S. ——] 136 S.Ct. 1364 [194 L.Ed.2d 376] (2016), *Henry v. State*, 175 So.3d 675 (Fla. 2015), *reh'g denied* (Sept. 24, 2015), *cert. denied*, [— U.S. ——] 136 S.Ct. 1455 [194 L.Ed.2d 552] (2016), *Gridine v. State*, 175 So.3d 672 (Fla. 2015), *reh'g denied* (Sept. 24, 2015), *cert. denied*, [—U.S. ——] 136 S.Ct. 1387 [194 L.Ed.2d 380] (2016), *Brown v. State*, 10 N.E.3d 1 (Ind. 2014), *State v. Null*, 836 N.W.2d 41, 45 (Iowa

The majority nonetheless says it would be inappropriate, and looked on with "disfavor" by the Supreme Court, for this Court to apply *Graham's* principles to Willbanks' sentence before the Supreme Court requires this Court to do so, even if this dissent is correct that aggregate sentences are the functional equivalent of LWOP. Respectfully, it is this Court's job to determine whether established constitutional principles require us to grant relief to the petitioner, as even one of the state cases on which the majority relies has recognized.[2] To do so does not require extending existing law but merely applying *Graham* to new facts, something courts do every day. As the Tenth Circuit said in applying *Graham* to aggregate sentences, "the Court's holding [in *Graham*] applies, not just to the factual circumstances of Graham's case, but to all juvenile offenders who did not commit homicide, and it prohibits, not just the exact sentence Graham received, but all sentences that would deny such offenders a realistic opportunity to obtain release." *Budder v. Addison, 851 F.3d 1047, 1053 (10th Cir. 2017).* This Court should so hold also, by joining the many well-reasoned decisions holding the Supreme Court did not intend to place form—the label of LWOP—over substance. A sentence that results in no meaningful opportunity for release during the

juvenile's lifetime is the functional equivalent of LWOP. These sentences violate the constitutional principles underlying *Graham* and *Miller* and are invalid. The juvenile must be allowed a meaningful opportunity for release.

The majority does not so much deny that some length of aggregate sentence will be found to be too long under *Graham*; rather, it says we cannot know what length is too much and, therefore, should just let all sentences stand until the Supreme Court expressly tells us how much is too much. Respectfully, the Supreme Court has done so already in telling us juveniles must have a "meaningful opportunity for release" prior to death. While the Supreme Court did not set out a specific length of years the juvenile must be afforded the opportunity to live outside prison, we do know keeping the juvenile in prison beyond his life expectancy is too long. Yet, that is what the majority is approving in this case, in which Willbanks received a sentence beyond his life expectancy.

In any event, the legislature already has determined at what point parole consideration should be offered; this Court merely needs to follow its lead. In response to *Miller*, Missouri's legislature adopted sec-

---

2013), State v. Pearson, 836 N.W.2d 88, 91 (Iowa 2013), as corrected (Aug. 27, 2013), State v. Ragland, 836 N.W.2d 107, 110 (Iowa 2013), Commonwealth v. Brown, [466 Mass. 676] 1 N.E.3d 259, 270 n.11 (2013), State v. Boston, 363 P.3d 453, 454 (Nev. 2015), as modified (Jan. 6, 2016), and Bear Cloud v. State, 334 P.3d 132 (Wyo. 2014).

**2.** See Vasquez v. Commonwealth, 291 Va. 232, 781 S.E.2d 920, 928 (2016) (holding the court had no authority to apply Graham); State v. Brown, 118 So.3d 332, 335-42 (La. 2013) (accord). See also State v. Ali, 895 N.W.2d 237 (Minn. 2017); Lucero v. People, 394 P.3d 1128 (Colo. 2017); State v. Springer, 856 N.W.2d 460, 469 (S.D. 2014) (reaching the merits),

cert. denied, —— U.S. ——, 135 S.Ct. 1908, 191 L.Ed.2d 775 (2015). Another jurisdiction, Nebraska, noted the issue whether Graham applies to aggregate sentences in State v. Mantich, 295 Neb. 407, 888 N.W.2d 376 (2016), but declined to resolve it on the facts of that case. The majority misstates the reason why this dissent says it is important to note that certiorari has been denied in these state court cases invalidating sentences that are the functional equivalent of LWOP. It is not to suggest the Supreme Court has *sub silencio* approved or disapproved of particular dispositions. It is to show the Supreme Court is not disapproving of state supreme courts weighing in on the Graham issue, as the majority seems to fear. The majority has not answered that point.

tion 558.047, RSMo 2016, which provides juvenile offenders sentenced to LWOP may apply for parole after 25 years. This Court has held it will apply this new stat-ute to all juvenile offenders regardless of whether convicted before or after *Montgomery v. Louisiana,* —— U.S. ——, 136 S.Ct. 718, 193 L.Ed.2d 599 (2016), as revised (Jan. 27, 2016). Like other states facing this issue, this Court similarly can apply time limits identical to those set out in section 558.047 to juvenile offenders who are serving de facto LWOP through their aggregate sentences. The majority's uncertainty as to where to draw the line when determining if a sentence is too long for aggregate juvenile offenders thereby becomes moot.[3]

The majority also writes as if courts can ignore the essential distinction mandated by the Supreme Court between sentences that are constitutional if imposed on adults and sentences that are *not* constitutional if imposed on juveniles. The majority says, because judges in cases involving adults can impose consecutive sentences, judges must be able to do so in the case of juveniles. Therefore, the majority seems to conclude, if a judge in a juvenile case simply avoids expressly labeling the sentences as "life without possibility of parole," there is no constitutional limitation, even if the judge knowingly imposes the functional equivalent of life without parole by aggregating consecutive sentences in such a way the juvenile will not have a meaningful opportunity for release before his or her death.

It is a fiction to suggest this is just a collateral result of sentencing the juvenile for multiple crimes. Judges impose consecutive sentences cognizant of the overall effect. The Supreme Court has taught us

that sentences permissible for adults may not be permissible for juveniles and that we must look at sentences for juveniles as a whole, not sentence by sentence, as discussed below in detail. This means:

> states may not circumvent the strictures of the Constitution merely by altering the way they structure their charges or sentences. Just as they may not sentence juvenile nonhomicide offenders to 100 years instead of 'life,' they may not take a single offense and slice it into multiple sub offenses in order to avoid *Graham's* rule that juvenile offenders who do not commit homicide may not be sentenced to live without the possibility of parole.

*Budder, 851 F.3d at 1058.*

In other words, substance, not form, should control. Whether labeled "LWOP," the sentences imposed on Willbanks are subject to *Graham's* categorical rule because like formal LWOP sentences, de facto life sentences also are the " 'denial of hope' " and mean " 'that good behavior and character improvement are immaterial . . . that whatever the future might hold in store for the mind and spirit of [the defendant], he will remain in prison for the rest of his days.' " *Graham, 560 U.S. at 70, 130 S.Ct. 2011, quoting, Naovarath v. State, 105 Nev. 525, 779 P.2d 944, 944 (1989).*

## I. THE PRINCIPLES OF GRAHAM APPLY TO AGGREGATE SENTENCES THAT ARE THE FUNCTIONAL EQUIVALENT OF LWOP

The great majority of states to reach the issue have determined the fundamental principles underlying *Graham* do apply to aggregate sentences, and such sentences violate the Eighth Amendment when they

---

**3.** Section 558.047 provides juvenile offenders sentenced to LWOP prior to August 28, 2016, and juvenile offenders sentenced after that date to life with parole or a term of 30 to 40 years may petition for a parole hearing after serving 25 years. § 558.047.1, RSMo 2016.

are of such length that they become a de facto life sentence because the juvenile offender is effectively denied release. To fully understand these courts' reasoning, it is helpful to first examine *Graham* itself in more depth, for it resulted in a radical change in how juvenile term-of-years sentences are reviewed. It is that radical change that provides the framework for the Supreme Court's decision in that case, as well as in *Miller* and *Montgomery,* and that requires the application of *Graham's* analysis to aggregate sentences such as those imposed on Willbanks.

### A. Graham *Considers Whether a Category of Sentence Can Be Imposed on Juveniles, Not Whether a Particular Sentence Seems Proportionate*

Before turning to the question whether a sentence of LWOP is unconstitutional when a juvenile is convicted of a nonhomicide offense, *Graham* took some time to describe the two broad approaches it applies to Eighth Amendment analysis: the case-by-case approach and the categorical approach. *Graham,* 560 U.S. at 59, 130 S.Ct. 2011.

Prior to *Graham,* the Supreme Court said, it had used the case-by-case, sentence-by-sentence approach in considering the constitutional validity of term-of-years sentences, a phrase *Graham* uses to refer to all sentences other than death, including life sentences, both LWOP and life with parole eligibility.[4] Under the case-by-case approach, *Graham* said, a court considers "all of the circumstances of the case to determine whether the sentence is unconstitutionally excessive." *Id.* If a defendant claims his or her particular sentence is unduly harsh, "Eighth Amendment analysis focuses on the sentence imposed for each specific crime, not on the cumulative sentence." *United States v. Aiello,* 864

F.2d 257, 265 (2d Cir. 1988). This is true for adults even when the sentences cumulatively extend to or beyond a defendant's lifetime, what some cases refer to as "discretionary life sentences." *See, e.g., McKinley v. Butler,* 809 F.3d 908, 911 (7th Cir. 2016); *State v. Riley,* 315 Conn. 637, 110 A.3d 1205, 1213 (2015), cert. denied, —— U.S. ——, 136 S.Ct. 1361, 194 L.Ed.2d 376 (2016). This traditional analysis begins by "comparing the gravity of the offense and the severity of the sentence." *Graham,* 560 U.S. at 60, 130 S.Ct. 2011. If the punishment seems grossly disproportional to the particular crime, the court then compares the sentence to that of others convicted of similar crimes. *Id.*

By contrast, *Graham* explained, when a defendant in a death penalty case claims he or she categorically is ineligible for death because of the nature of the offense or the characteristics of the offender, then the Supreme Court traditionally uses what it calls the "categorical approach." *Id. at* 61-62, 130 S.Ct. 2011. For example, the Supreme Court held nonhomicide crimes such as rape never merit the death penalty because the category of offense just does not merit the ultimate penalty. *See, e.g., Kennedy v. Louisiana,* 554 U.S. 407, 413, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008), *as modified (Oct. 1, 2008), opinion modified on denial of reh'g,* 554 U.S. 945, 129 S.Ct. 1, 171 L.Ed.2d 932 (2008). Similarly, the Supreme Court held in *Roper v. Simmons,* 543 U.S. 551, 559-67, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), and *Atkins v. Virginia,* 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), that a state is barred from imposing the death penalty on offenders who have the characteristics of either youth or mental disability. In such cases, a court has no discretion to

---

4. Other courts generally use the phrase "term-of-years" to distinguish sentences that

are not labeled "life," creating further confusion. *E.g., Vasquez,* 781 S.E.2d at 925.

impose a death sentence on those categories of offenders. Such a sentence is unconstitutional, and the trial court does not have discretion to impose an unconstitutional sentence. *See Hurst v. Florida,* ─── U.S. ───, *136 S.Ct. 616, 624, 193 L.Ed.2d 504 (2016).*

*Graham,* for the first time, applied the categorical approach to a sentence other than death. It held that, while the case-by-case approach is appropriate when determining whether a particular sentencing decision is fair for a single offender, it is inadequate when the claim is that a particular type or category of sentence is unfair for a category of persons. In *Graham,* the defendant claimed LWOP was improper for all nonhomicide offenses committed by juveniles. To determine whether such sentences are indeed unconstitutional, the Supreme Court held it must apply the categorical approach, just as it already did in death penalty cases:

This case implicates a particular type of sentence as it applies to an entire

class of offenders who have committed a range of crimes. As a result, a threshold comparison between the severity of the penalty and the gravity of the crime does not advance the analysis. Here, in addressing the question presented, the appropriate analysis is the one used in cases that involved the categorical approach, specifically *Atkins, Roper,* and *Kennedy.*

*Graham, 560 U.S. at 61-62,* 130 S.Ct. 2011.

In other words, because the Supreme Court has held juveniles must be placed in a special category based on the "characteristics of the offender" (their youth) and not the "nature of the offense," it is improper in cases involving juveniles merely to weigh a particular sentence against the gravity of the offense in a particular case. *Id. at 60-61, 130 S.Ct. 2011.* Rather, "the Court then announced a categorical rule:

The constitution prohibits the imposition of a life without parole sentence on a juvenile defender who did not commit homicide." *Budder, 851 F.3d 1047 (10th Cir. 2017).* This categorical approach must be used to determine whether it violates the Eighth Amendment to utilize the sentencing practice being attacked for that category of offender—juveniles. *Id. at 60-62, 130 S.Ct. 2011.*

*Graham* held the unique characteristics of juveniles categorically barred the application of a LWOP sentence for a nonhomicide offense because such sentences are justified by "none of the legitimate goals of penal sanctions—retribution, deterrence, incapacitation, and rehabilitation." *Id. at 50, 130 S.Ct. 2011.* Juvenile offenders have lessened culpability and are less deserving of the most severe punishments. *Id. at 68, 130 S.Ct. 2011, citing, Roper, 543 U.S. at 569, 125 S.Ct. 1183.* Lack of maturity and the inability to consider possible punishment make juveniles less susceptible to deterrence. *Id. at 72, 130 S.Ct. 2011.* Because it is dubious whether the sentencer can at the outset determine that a juvenile is "irredeemable," interest in incapacitation for fear of recidivism is diminished. *Id. at 72-73, 130 S.Ct. 2011.* Finally, LWOP closes the door forever to furthering the goal of rehabilitation. *Id. at 73-74, 130 S.Ct. 2011.*

**B. Sentences That Are the Functional Equivalent of LWOP Are Categorically in Violation of Graham *Principles***

The majority ignores the categorical approach taken by the Supreme Court in *Graham* and continues to apply a term-of-years, sentence-by-sentence approach as if *Graham* had not changed how juvenile sentences should be analyzed; it simply ignores the lengthy discussion in *Graham,* and in this dissent, of the categorical ap-

proach that must be taken when reviewing juvenile sentences.

Fortunately, other courts have followed *Graham* more faithfully by taking its categorical approach in considering whether Eighth Amendment principles bar the imposition of aggregate sentences that cumulatively are so long they are the functional equivalent of LWOP because they allow the juvenile offender no meaningful opportunity for release. As discussed below, the vast majority of these courts have found such aggregate sentences do violate the Eighth Amendment. The reasoning of these cases is so consistent, so persuasive, and so dispositive of the result here that this is the unusual case in which it is appropriate to at least briefly discuss these cases in turn.

*Graham* itself arose in Florida, so perhaps it is not surprising that the Florida Supreme Court has studied its meaning carefully. Resolving a split in the Florida appellate courts, in *Henry v. State, 175 So.3d 675 (Fla. 2015)*, the Florida Supreme Court held in no uncertain terms that *Graham*'s reasoning applies to aggregate or lengthy term-of-years sentences.

The defendant in *Henry* received sentences for multiple nonhomicide offenses that aggregated to 90 years. As in the instant case, the state argued *Graham* applied only to single sentences of LWOP and not to sentences that, considered as an aggregate, were the functional equivalent of life without parole. *Henry* rejected that argument, holding *Graham* said juveniles are categorically different than adults, so:

the Eighth Amendment prohibits the states from sentencing juvenile nonhomicide offenders to terms of imprisonment in which the states pre-establish that these offenders "never will be fit to reenter society." [*Graham*, 560 U.S.], at 75, 130 S.Ct. 2011. ... In so doing, the Supreme Court intended to ensure that

the states would provide all juvenile nonhomicide offenders who were sentenced to life terms of imprisonment with meaningful future opportunities to demonstrate their maturity and rehabilitation.

*Henry, 175 So.3d at 679.* Applying this principle, the Florida Supreme Court concluded:

*Graham* requires a juvenile nonhomicide offender, such as Henry, to be afforded such an opportunity [for release] during his or her natural life. *Id.* Because Henry's aggregate sentence, which totals ninety years, and requires him to be imprisoned until he is at least nearly ninety five years old, does not afford him this opportunity, that sentence is unconstitutional under *Graham.*

*Henry, 175 So.3d at 679-80.* Therefore, "[i]n light of *Graham*, ... we conclude that the Eighth Amendment will not tolerate prison sentences that lack a review mechanism for evaluating this special class of offenders for demonstrable maturity and reform in the future because any term of imprisonment for a juvenile is qualitatively different than a comparable period of incarceration is for an adult." *Id.* at 680.

In 2016, the Florida Supreme Court reaffirmed that, because *Graham* dealt with substance, not labels, "[i]t is thus evident from our case law that this Court has—and must—look beyond the exact sentence denominated as unconstitutional by the Supreme Court and examine the practical implications of the juvenile's sentence, in the spirit of the Supreme Court's juvenile sentencing jurisprudence." *Atwell v. State, 197 So.3d 1040, 1047 (Fla. 2016)* (holding *Miller* applies to any sentence denominated life and a sentence of LWOP for robbery clearly violated *Graham*); *see also Gridine v. State, 175 So.3d 672 (Fla. 2015)* (*Graham* applies to a single 70-year sentence for attempted murder, which in Flor-

ida is a nonhomicide offense, though the sentence is not specifically denominated LWOP).

In one of the most recent cases, the Ohio Supreme Court joined the myriad other state supreme courts holding *Graham* categorically prohibits aggregate term-of-years sentences for multiple nonhomicide convictions that exceed the defendant's life expectancy. *State v. Moore, No. 2016-Ohio-8288, 149 Ohio St.3d 557, 76 N.E.3d 1127(2016).*[5] *Moore* held that *Graham*'s rationale requires all juvenile defendants be given an actual meaningful opportunity to obtain release and that *Graham* "did not limit that holding to juveniles who were sentenced for only one offense." *Id. at 574, 76 N.E.3d 1127, 2016 WL 7448751 at *15.*

As the Ohio Supreme Court so eloquently noted, "The number of offenses committed cannot overshadow the fact that it is a child who has committed them." *Id. Moore* concluded there is no consequential distinction between LWOP and aggregate term-of-years sentences, a fact the Supreme Court itself has recognized in other contexts. *Id. at 568-70, 76 N.E.3d 1127, 2016 WL 7448751 at *10-11; see, e.g., Summer v. Shuman, 483 U.S. 66, 83, 107 S.Ct. 2716, 97 L.Ed.2d 56 (1987)* ("[T]here is no basis for distinguishing, for purposes of deterrence, between an inmate serving a life sentence without possibility of parole and a person serving several sentences of a number of years, the total of which exceeds his normal life expectancy."). *Graham* recognizes all juveniles are different

and have a lesser culpability because of their immaturity. This is why their claims of an Eighth Amendment violation must be considered categorically rather than by a term-of-years, sentence-by-sentence approach, as is done for adult offenders. *Moore, 149 Ohio St.3d at 564-65, 572-75, 76 N.E.3d 1127, 2016 WL 7448751, at *7, *14-15.*

California took this same approach in *People v. Caballero, 55 Cal.4th 262, 145 Cal.Rptr.3d 286, 282 P.3d 291 (2012).* The defendant in *Caballero* was convicted of three counts of attempted murder (which in California is a nonhomicide offense) as well as assault and a firearms offense. The court imposed consecutive sentences of 15 to 25 years to life, resulting in an aggregate sentence under which the defendant would be imprisoned for 110 years before he would be eligible for parole consideration. *Id., 145 Cal.Rptr.3d 286, 282 P.3d at 293, 295.* The California Supreme Court rejected the state's argument—the same one the State makes here—that each sentence for each crime should be considered individually rather than in the aggregate, and so considered they were not grossly disproportionate to the crimes. *Id., 145 Cal.Rptr.3d at 294-95, 282 P.3d at 293, 295.* To the contrary, *Caballero* said, *Miller* instructed:

> "[N]one of what [*Graham*] said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime-specific. Those features are evident in the same way, and to the same degree, when ...

---

**5.** Moore's sentences aggregated to 112 years based on convictions on 12 counts of assault. He would have been eligible for parole after 77 years, when he would be 92 years old. *Moore, 149 Ohio St.3d at 563-64, 76 N.E.3d 1127, 2016 WL 7448751, at *6.* The majority suggests *Graham* was a single crime case. But *Moore* correctly notes that, although at various points *Graham* states it is dealing with a

single sentence, in fact, Graham was convicted of multiple crimes and given multiple concurrent sentences. *Id. at 572-74, 76 N.E.3d 1127, 2016 WL 7448751 at *14.* Because in Florida all life sentences are without parole, the effect is like a single LWOP sentence, and the number of years imposed for the other crimes was irrelevant. *See Graham, 560 U.S. at 57, 130 S.Ct. 2011.*

a botched robbery turns into a killing. So, *Graham*'s reasoning implicates any life without parole sentence imposed on a juvenile, even as its categorical bar relates only to nonhomicide offenses." *Id., quoting, Miller, 132 S.Ct. at 2465.*

*Caballero* concluded that by this language *Miller*, therefore, "made it clear that *Graham*'s 'flat ban' on life without parole sentences" applies to all nonhomicide cases involving juvenile offenders, including the term-of-years sentence that amounts to the functional equivalent of a life without parole. *Id., 145 Cal.Rptr.3d at 294, 282 P.3d at 293, 295.*[6] The *Caballero* majority concluded:

> Defendant ... will become parole eligible over 100 years from now. ... Consequently, he would have no opportunity to "demonstrate growth and maturity" to try to secure his release, in contravention of *Graham's* dictate. ... *Graham*'s analysis does not focus on the precise sentence meted out. Instead, as noted above, it holds that a state must provide a juvenile offender "with some realistic opportunity to obtain release" from prison during his or her expected lifetime.

*Id., 145 Cal.Rptr.3d 286, 282 P.3d at 295.*

As noted earlier, Nevada also has held *Graham* applies to sentences that are the functional equivalent of a sentence of life without the possibility of parole. *Boston, 363 P.3d at 457.* Were it to adopt the contrary position taken by the state in that case (and by the majority in the instant case), Nevada held:

> [W]e would undermine the [United States Supreme] Court's goal of "prohibit[ing] States from making the judgment at the outset that those offenders never will be fit to reenter society." *[Graham, 560 U.S.]* at 75, 130 S.Ct. 2011.... As this court has previously stated, a sentence of life without the possibility of parole for a juvenile offender "means denial of hope; it means that good behavior and character improvement are immaterial; ...."

*Id. at 457.* Citing the Ninth Circuit's decision in *Moore v. Biter, 725 F.3d 1184 (9th Cir. 2013),* the Nevada Supreme Court concluded that treating consecutive aggregate sentences as the functional equivalent of LWOP "best addresses the concerns enunciated by the U.S. Supreme Court and this court regarding the culpability of juvenile offenders and the potential for growth and maturity of these offenders." *Boston, 363 P.3d at 458.*

Iowa is also instructive. The Iowa Supreme Court released a trio of opinions applying *Graham* and *Miller*: *State v. Pearson, 836 N.W.2d 88 (Iowa 2013), State v. Ragland, 836 N.W.2d 107(Iowa 2013),*

---

**6.** The concurring opinion in *Cabellero* was equally insightful, stating:

> [T]he purported distinction between a single sentence of life without parole and one of component parts adding up to 110 years to life is unpersuasive. The gist of *Graham* is not only that life sentences for juveniles are *unusual* as a statistical matter, they are *cruel* as well because "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds." ... Further, the high court in *Graham* noted, "With respect to life without parole for juvenile nonhomicide offenders, none of the goals of penal

sanctions that have been recognized as legitimate—retribution, deterrence, incapacitation, and rehabilitation—provides an adequate justification."

*Caballero, 145 Cal.Rptr.3d 286, 282 P.2d at 297-98* (Werdegar, J., concurring), *quoting, Graham, 560 U.S. at 68, 130 S.Ct. 2011.* The concurring opinion also noted that the fact the dissents in *Graham* had said *Graham*'s holding was limited to single LWOP sentences was not persuasive, for "[c]haracterization by the *Graham* dissenters of the majority opinion is, of course, dubious authority." *Id., 145 Cal. Rptr.3d 286, 282 P.3d 291 at 297.*

and *State v. Null*, 836 N.W.2d 41(Iowa 2013). *Pearson* is the most factually similar.[7] The defendant was convicted of first-degree robbery and first-degree burglary for each of two incidents at two different houses on the same day and received consecutive 25-year sentences. *Pearson*, 836 N.W.2d at 89. This brought his cumulative sentence to 50 years with parole eligibility after 35 years. *Id.* at 89, 92-93.

The Iowa Supreme Court held the aggregate sentence imposed was the functional equivalent of LWOP and the underlying principles of *Roper*, *Graham*, and *Miller* applied, stating, "Though *Miller* involved sentences of life without parole for juvenile homicide offenders, its reasoning applies equally to Pearson's sentence of thirty-five years without the possibility of parole for these offenses" even though this was less than the juvenile's life expectancy. *Pearson*, 836 N.W.2d at 96.[8] Then, extending *Miller* under an Iowa constitutional provision identical to the Eighth Amendment, the court held a *Miller*-type hearing is required before any lengthy aggregate sentence can be imposed on a juvenile so as not to effectively deprive the juvenile of the possibility of a meaningful opportunity for release. *Id.*

The New Jersey Supreme Court is one of the most recent state supreme courts to weigh in, holding juveniles cannot receive consecutive sentences that are the functional equivalent of LWOP. That court found "the force and logic of *Miller*'s concerns apply broadly: to cases in which a defendant commits multiple offenses during a single criminal episode," including when "a defendant commits multiple offenses on different occasions." *State v. Zuber*, 227 N.J. 422, 152 A.3d 197, 212 (2017). *Zuber* noted the rationale behind *Roper*, *Graham*, *Miller*, and *Montgomery* depends not on whether a sentence is labeled LWOP but on the characteristics of juveniles and the effect of those characteristics on penological goals. *Id.* at 207-11. It found that to be guided by whether a sentence was labeled LWOP incorrectly elevated form over substance, stating:

> Defendants who serve lengthy term-of-years sentences that amount to life without parole should be no worse off than defendants whose sentences carry that formal designation. The label alone cannot control; we decline to elevate form over substance.

*Id.* at 212. Rather, *Zuber* said the relevant question is the practical effect of the aggregate sentences imposed:

> Will a juvenile be imprisoned for life, or will he have a chance at release? It does not matter to the juvenile whether he faces formal "life without parole" or multiple term-of-years sentences that, in all likelihood, will keep him in jail for the rest of his life. We believe it does not

7. The other two cases reached similar results, analyzing the cases under *Graham* and *Miller* but deciding them under its comparable state constitutional provision. *Ragland*, 836 N.W.2d at 110, 121-22 (single homicide offense with a lengthy sentence) ("Accordingly, we hold *Miller* applies to sentences that are the functional equivalent of life without parole. The commuted sentence in this case—life with parole eligibility after 60 years—is the functional equivalent of a life sentence without parole."); *Null*, 836 N.W.2d at 45, 71 (lengthy sentences for homicide and nonhomicide offenses)

("[W]hile a minimum of 52.5 years imprisonment is not technically a life-without-parole sentence, such a lengthy sentence imposed on a juvenile is sufficient to trigger *Miller*-type protections.").

8. Indeed, the Iowa Supreme Court has noted one of the *Miller* defendants was convicted of multiple offenses, yet that did not affect the need to meet the requirements of *Graham* and *Miller*. *Null*, 836 N.W.2d at 73.

matter for purposes of the Federal or State Constitution either.

*Id. at 211.*[9]

Connecticut reasoned consistently in *Riley,* a case involving a juvenile convicted of murder, attempted murder, first-degree assault, and conspiracy to commit murder, and sentenced to a total of 100 years without consideration of age as a mitigating factor. *Riley, 110 A.3d at 1206-08.* The court held this violated *Miller* and ordered resentencing. *Id. at 1218-19.* "It is undisputed that this sentence is the functional equivalent to life without the possibility of parole." *Id. at 1207.* In Connecticut's penal code, a "life sentence" is defined as either LWOP or a definite term of 60 years or more. *Id. at 1207 n.2.* The court explored the *Graham* issue but concluded the issue was not yet ripe because, on resentencing, Riley may get a *Graham*-compliant sentence. *Id. at 1218-19.*

Other state supreme courts have been asked to determine the applicability of *Graham* and *Miller* to cases in which the defendant committed homicide and nonhomicide offenses together, as is often the case when a criminal commits a violent crime using a weapon. Most of these courts also have found *Graham* and *Miller*'s requirement that a juvenile defendant be given the opportunity to show he is not in the select few defendants who are so irreparably corrupt they deserve LWOP, applies equally to de facto LWOP sentences imposed for nonhomicide offenses that occurred at the same time as the homicide offense. Although sometimes differing slightly in their reasoning or facts—some involve state constitutional

law, others a single longer than life term-of-years sentence—each holds a juvenile cannot be given a sentence that results in a de facto life sentence when the jury does not find the defendant deserves LWOP for his or her homicide offense.

The Indiana Supreme Court used this type of reasoning in reducing a sentence of 150 years to one of 80 years (which, under the court's reasoning, presumably would allow for release during the defendant's lifetime). *Brown v. State, 10 N.E.3d 1 (Ind. 2014).* It held *Roper, Graham* and *Miller* had shown juveniles are categorically different than adults, and their special characteristics and immaturity must be taken into account in their sentencing. This applied equally to the consecutive sentences at issue in *Brown* as it did to the single LWOP sentences in *Graham* and *Miller,* the Indiana Supreme Court said, for "[s]imilar to a life without parole sentence, Brown's 150 year sentence 'forswears altogether the rehabilitative ideal.'" *Brown, 10 N.E.3d at 8, quoting, Graham, 560 U.S. at 74, 130 S.Ct. 2011.* It found such a sentence "means denial of hope" and the defendant will remain in prison for the rest of his days. *Id.* The court concluded, in exercising its authority under its state constitution to revise sentences, that when determining whether the sentence was excessive, it should "'focus on the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any individual count.'" *Brown, 10 N.E.3d at 8, quoting, Cardwell v. State,*

**9.** As further discussed in *State v. Nathan, SC95473, slip op., 522 S.W.3d 881, 2017 WL 2952773 (Mo. banc 2017)* (Stith, J., dissenting), also handed down this date, for the same reasons the New Jersey Supreme Court held in *Zuber* that *Graham* and *Miller* apply to sentences that include punishment for a

homicide offense because the focus is not on the offense alone, but principally is focused on the characteristics of the offender, because "youth matters under the Constitution" any time there is a "lengthy sentence that is the practical equivalent of [LWOP]." *Id. at 212.*

895 N.E.2d 1219, 1225 (Ind. 2008). It reduced the sentence. *Id.*

Wyoming relied on both Iowa and Indiana in reaching a similar result in *Bear Cloud v. State,* 334 P.3d 132 (Wyo. 2014). Bear Cloud was convicted of first-degree murder and two burglary related charges, for which he received consecutive sentences of life in prison and two 20- to 25-year sentences. *Id. at 135.* His certiorari petition was pending at the Supreme Court when *Miller* was decided, and the Supreme Court vacated the judgment and remanded the case for resentencing in light of *Miller. Id.* After some confusion as to how to proceed, a hearing was held, and he was resentenced to life with the possibility of parole after 25 years on the murder charge, to run consecutive to the two 20- to 25-year undisturbed sentences on the two nonhomicide charges, so he would be eligible for release after 45 years, at age 61. *Id. at 136.*

*Bear Cloud* held these sentences violated *Graham* and *Miller* because the sentences for the nonhomicide offenses had been imposed without considering the factors set out in *Miller.* Sentencing this way was error, because "[t]o do otherwise would be to ignore the reality that lengthy aggregate sentences have the effect of mandating that a juvenile 'die in prison even if a judge or jury would have thought that his youth and its attendant characteristics, along with the nature of his crime, made a lesser sentence [for example, life *with* the possibility of parole] more appropriate.'" *Id. at 142, quoting, Miller,* 132 S.Ct. at 2460. The court concluded, "Like the Indiana Supreme Court, we will 'focus on the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any individual count.'" *Bear Cloud,* 334 P.3d at 142, quoting, Brown, 10 N.E.3d at 8.

The Wyoming Supreme Court further held, in determining whether the defendant was one of the rare "'irredeemable'" juveniles "'deserving of incarceration for the duration of their lives,'" *id. at 144, quoting, Graham,* 560 U.S. at 75, 130 S.Ct. 2011, the categorical considerations laid out in *Graham* and *Miller* must be applied "to the entire sentencing package, when the sentence is [LWOP], or when aggregate sentences result in the functional equivalent of [LWOP]." *Bear Cloud,* 334 P.3d at 144. Moreover, that analysis would not change depending on whether the aggregate sentence is more than or less than the offender's actual life expectancy; the issue is whether he will have a meaningful opportunity for release. *Id.*

The Illinois Supreme Court also recently decided a case holding *Graham* and *Miller* apply to an aggregate sentence for homicide and nonhomicide offenses, stating:

> In this case, defendant committed offenses in a single course of conduct that subjected him to a legislatively mandated sentence of 97 years, with the earliest opportunity for release after 89 years. Because defendant was 16 years old at the time he committed the offenses, the sentencing scheme mandated that he remain in prison until at least the age of 105. The State concedes, and we agree, that defendant will most certainly not live long enough to ever become eligible for release. Unquestionably, then, under these circumstances, defendant's term-of-years sentence is a mandatory, *de facto* life-without-parole sentence. We therefore vacate defendant's sentence as unconstitutional pursuant to *Miller.*

*People v. Reyes,* 407 Ill.Dec. 452, 63 N.E.3d 884, 888 (2016).

In January of this year, the Washington Supreme Court similarly held *"Miller'* s reasoning clearly shows that it applies to any juvenile homicide offender who might

be sentenced to die in prison without a meaningful opportunity to gain early release based on demonstrated rehabilitation." *State v. Ramos, 187 Wash.2d 420, 387 P.3d 650, 660 (2017)*. In so holding, *Ramos* rejected "the notion that *Miller* applies only to literal, not de facto, life-without-parole sentences" because "youth matters on a constitutional level." *Id. at 655, 660*.

> Holding otherwise would effectively prohibit the sentencing court from considering the specific nature of the crimes and the individual's culpability before sentencing a juvenile homicide offender to die in prison, in direct contradiction to *Miller*. Whether that sentence is for a single crime or an aggregated sentence for multiple crimes, we cannot ignore that the practical result is the same.

*Id. at 660*. This is because "the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, *even when they commit terrible crimes*." *Id., quoting, Miller, 132 S.Ct. at 2465* (emphasis added). Every juvenile, therefore, is entitled to a *Miller* hearing.[10]

The Massachusetts Supreme Court similarly cited with approval the decisions in *Caballero, Ragland*, and *Null* and directed the legislature to be guided by them in determining what was a constitutional sentence, stating:

> We emphasize, however, that a constitutional sentencing scheme for juvenile homicide defendants must take account of the spirit of our holdings today here and in *Diatchenko*, and avoid imposing

on juvenile defendants any term so lengthy that it could be seen as the functional equivalent of a sentence of life without parole. See, e.g., *People v. Caballero*, 55 Cal.4th 262, 145 Cal.Rptr.3d 286, 282 P.3d 291, 295 (2012) (sentence to minimum prison term that exceeds juvenile defendant's natural life expectancy violates Eighth Amendment's bar against cruel and unusual punishment); *State v. Ragland*, 836 N.W.2d 107, 111, 121–122 (Iowa 2013) (*Miller* applies to juvenile sentences that are "functional equivalent" of life without parole, and sentence of life with parole eligibility only after sixty years was functional equivalent of life without parole); *State v. Null*, 836 N.W.2d 41, 45, 71 (Iowa 2013) (mandatory seventy-five year sentence resulting from aggregation of two mandatory sentences that permitted parole eligibility only after fifty-two and one-half years for juvenile was "such a lengthy sentence" that it was "sufficient to trigger *Miller*-type protections").

*Com. v. Brown, 466 Mass. 676, 1 N.E.3d 259, 270 n.11 (2013)*.

## C. The Tenth, Ninth and Seventh Circuits Apply *Graham* to Aggregate Sentences

Like the state supreme court decisions just discussed, three federal courts of appeals also have found *Graham* applies to sentences that aggregate to beyond a juvenile defendant's life expectancy. Most recently, in *Budder*, the Tenth Circuit invalidated three consecutive 45-year sentences for violent nonhomicide offenses. It held

---

**10.** By contrast to the defendant in *Nathan*, whom the jury found was not irreparably corrupt, the Washington Supreme Court held, after a *Miller* hearing, Ramos was not barred from receiving a lengthy sentence because he failed to show his crime was due to "a lack of maturity and an underdeveloped sense of responsibility leading to recklessness, impulsivi-ty, and heedless risk-taking." *Id. at 667*. The opinion also notes, even so, Ramos would have a right under a recent Washington statute to seek release after 20 years if he did not commit a crime as an adult and otherwise met the statutory requirements for early release. *Id. at 659*.

*Graham'* s categorical rule prohibited the imposition of any sentence on a juvenile offender if it requires the juvenile to spend his or her life in prison, whether that sentence is labeled life without parole or whether it is labeled as multiple term of year sentences. The Tenth Circuit rejected Oklahoma's arguments that aggregate sentences are not barred by *Graham* even if they are the functional equivalent of LWOP, stating:

> Despite Oklahoma's arguments to the contrary, we cannot read the Court's categorical rule as excluding juvenile offenders who will be imprisoned for life with no hope of release for nonhomicide crimes merely because the state does not label this punishment as "life without parole." The Constitution's protections do not depend upon a legislature's semantic classifications. Limiting the Court's holding by this linguistic distinction would allow states to subvert requirements of the Constitution by merely sentencing their offenders to terms of 100 years instead of 'life.' The Constitution's protections are not so malleable.

*Budder, 851 F.3d at 1056.* The Tenth Circuit continued:

> More importantly, the Court did not just hold that it violated the Eighth Amendment to sentence a juvenile nonhomicide offender to life without parole; it held that, when the state imposes a sentence of life on a juvenile nonhomicide offender, it must provide that offender with 'a meaningful opportunity to obtain release.'

*Id. at 1056-57. Graham* "must be read to apply to all sentences that are of such

length that they would remove any possibility of eventual release." *Id.*

In *Moore, 725 F.3d at 1191,* the Ninth Circuit held California's affirmance of Moore's 254-year term-of-years sentence "for multiple crimes was contrary to *Graham* because there are no constitutionally significant distinguishable facts between Graham's and Moore's sentences." *Id.* (internal quotation omitted). The Ninth Circuit concluded Moore's sentence "is materially indistinguishable from a life sentence without parole because Moore will not be eligible for parole within his lifetime. Moore's sentence determines 'at the outset that [Moore] never will be fit to reenter society.'" *Id., quoting, Graham, 560 U.S. at 75, 130 S.Ct. 2011.*[11]

Aggregate sentences that are the functional equivalent of LWOP are contrary to *Graham,* the Ninth Circuit held, because in *Graham* "the Supreme Court chose a categorical approach, i.e., a flat-out rule that *'gives all juvenile nonhomicide offenders* a chance to demonstrate maturity and reform.'" *Moore, 725 F.3d at 1193, quoting, Graham, 560 U.S. at 79, 130 S.Ct. 2011* (emphasis added in *Moore*). *Moore,* therefore, held, "Under *Graham,* juvenile nonhomicide offenders may not be sentenced to life without parole regardless of the underlying nonhomicide crime." *Id.*

And, lest it be suggested that the Ninth Circuit's decision is an outlier, the Seventh Circuit reached a similar result in *McKinley, 809 F.3d at 911.* The Seventh Circuit held that McKinley's two consecutive 50-year sentences, one for first-degree murder and one for armed criminal action, violated *Miller* because he would not be

---

11. On remand, Moore was made eligible for parole at age 62. *People v. Moore, No. B260667, 2015 WL 8212832, at \*1 (Cal. Ct. App. Dec. 8, 2015).* The appellate court found his appeal of the new sentence moot due to a statute granting young offenders sentenced to

a specific term of years for crimes committed prior to age 23 the right to parole eligibility after 15 years of incarceration. *People v. Moore, No. B260667, 2017 WL 347460, at \*3 (Cal. Ct. App. Jan. 24, 2017).*

eligible for parole until age 116. *Id. at 909.* In so holding, the Seventh Circuit noted that LWOP or its equivalent can be imposed even in a homicide case only if the trial judge or jury considers the *Miller* factors as to both the homicide and nonhomicide charges, which had not occurred there. *Id. at 914.* The same reasoning necessarily applied to the 100-year sentence in that case; it was "a *de facto* life sentence, and so the logic of *Miller* applies." *Id. at 911.*[12]

### D. Cases Cited by the Majority Opinion Are Not Persuasive

In holding that it would not consider the applicability of *Graham,* the majority cites a few state supreme courts that it suggests "have held that *Graham* does not apply to prohibit multiple fixed-term sentences for juvenile offenders." *Willbanks, op. at 244.* A closer look at these cases greatly diminishes their relevance.

In *State v. Brown, 118 So.3d 332, 342 (La. 2013),* in deciding that it simply did not have the authority to apply *Graham* to aggregate sentences, the Louisiana Supreme Court relied in part on the dissenting opinions in *Graham,* on a Florida appellate court decision that has since been reversed (*Henry v. State, 82 So.3d 1084, (Fla. Dist. Ct. App. 2012), reversed by Henry, 175 So.3d 675*), and on its improper reliance on the deferential standard applicable to federal court review of state sentences. For all the reasons noted *infra,* it

is wrong. Indeed, it and Virginia are the only state supreme courts to conclude they are powerless to determine the constitutional validity of a sentencing practice under principles enunciated in prior Supreme Court cases simply because the Supreme Court has not yet expressly applied those principles to that particular sentencing practice, as described *infra.* In light of these errors, Louisiana's determination that it cannot apply *Graham* to multiple aggregate sentences is not persuasive.

The majority also cites to Virginia's decisions in *Vasquez v. Com., 291 Va. 232, 781 S.E.2d 920, 928 (2016),* and *Angel v. Com., 281 Va. 248, 704 S.E.2d 386, 401 (2011).* Virginia offers little reasoning other than its summary and incorrect conclusion that applying *Graham* to aggregate sentences would violate its duty to apply "the holdings of the highest court in the land" as set out by the Supreme Court. *Vasquez, 781 S.E.2d at 926.* Again, for the reasons discussed *infra,* that just misunderstands a state supreme court's authority. Moreover, as the concurring opinion notes, Vasquez's sentence did involve a meaningful opportunity for release under Virginia's geriatric release statute, and thus the sentence did not violate *Graham. Id. at 931*130 S.Ct. 2011 (Mims, J., concurring); *accord, Angel* (no constitutional violation when meaningful opportunity for release provided by the geriatric statute).[13]

---

12. While *Miller* did not involve multiple consecutive sentences, the Seventh Circuit concluded, "A straw in the wind is that the Supreme Court vacated, for further consideration in light of *Miller,* three decisions upholding as an exercise of sentencing discretion juveniles' sentences to life in prison with no possibility of parole." *McKinley, 809 F.3d at 914.* In other words, the Supreme Court had itself indicated by these remands that multiple aggregate sentences needed to be reconsidered in light of *Graham* and *Miller.*

13. Virginia's "conditional release for geriatric inmates" statute, Va. Code Ann. § 53.1-40.01 provides in its entirety:

Any person serving a sentence imposed upon a conviction for a felony offense, other than a Class 1 felony, (i) who has reached the age of sixty-five or older and who has served at least five years of the sentence imposed or (ii) who has reached the age of sixty or older and who has served at least ten years of the sentence imposed *may petition the Parole Board for conditional release.* The Parole Board shall promulgate regula-

The majority also relies on *State v. Springer, 856 N.W.2d 460 (S.D. 2014), cert. denied sub nom. Springer v. S. Dakota, —— U.S. ——, 135 S.Ct. 1908, 191 L.Ed.2d 775 (2015)*. But *Springer* simply does not involve a sentence that is the functional equivalent of LWOP. While the defendant nominally received a 61-year sentence for a single nonhomicide offense, under South Dakota law he would be eligible for parole in 33 years when he would be 49 years old. *Id. at 466-68*. This is why *Springer* held the sentence did not violate *Graham*. In fact, in a footnote *Springer* specifically stated, "We are not implying that a lengthy term-of-years sentence, like the 261-year sentence here, can never be a de facto life sentence," and explicitly tied its holding to the fact Springer was not denied a meaningful opportunity for release because he would be parole eligible at age 49. *Id. at 470 n.8*. For similar reasons, neither are the other state cases it cites persuasive.

The majority also relies on the Sixth Circuit's decision in *Bunch v. Smith, 685 F.3d 546, 549 (6th Cir. 2012)*, to conclude the Sixth Circuit has determined *Graham* does not apply to aggregate sentences because *Graham* involved a single sentence. It is wrong for multiple reasons.

First, and most basically, the defendant in *Graham did not* receive a de jure sentence of LWOP. Rather, as both the Tenth Circuit and the Ohio Supreme Court have noted, he was convicted of multiple crimes including armed burglary with assault or battery and attempted armed robbery, and he received a simple life sentence for burglary and a 15-year sentence for use of a weapon during the burglary. *Budder, 851 F.3d at 1055-56* ("In fact, it is important to note that Graham himself was not sentenced to 'life without parole'; he was sentenced to 'life'"); *Moore, 149 Ohio St.3d at 573, 76 N.E.3d 1127, 2016 WL 7448751, at \*14* ("We note at the outset that the defendant in *Graham* had committed multiple offenses."), *citing, Graham, 560 U.S. at 53-54, 130 S.Ct. 2011*. But, because at that time Florida had abolished parole, the defendant's life and 15-year sentences were, as a practical matter, the functional equivalent of LWOP.[14] *Id.* "In this context, there is no material distinction between a sentence for a term of years so lengthy that it "effectively denies the offender any material opportunity for parole" and one that will imprison him for "life" without the opportunity for parole—both are equally irrevocable." *Budder, 851 F.3d at 1056*.

The Supreme Court, therefore, looked at the reality that Graham's sentence, although not labeled LWOP, in practical effect was LWOP. In other words, *Graham* looked not at the *de jure* label of the sentence imposed as simply "life," but at its *de facto* effect, which was that it was a sentence that "gives no chance for fulfillment outside prison walls, no chance for reconciliation with society, no hope," and held it invalid under the Eighth Amendment. *Graham, 560 U.S. at 79, 82, 130 S.Ct. 2011*. For this reason, the Tenth Circuit has held the sentencing practice that was the Supreme Court's focus in *Graham* was any sentence that denies a juvenile nonhomicide offender a realistic opportunity to obtain release within his lifetime. *Budder, 851 F.3d at 1057*.

Willbanks simply asks this Court to do the same—to look at the practical reality

---

tions to implement the provisions of this section.
*Id.* (emphasis added).

14. That is a matter the legislature can change, however and, in fact, the Florida legislature has done so for life sentences. *Fla. Stat. Ann. § 921.1401 (West)*.

of his sentence, just as the Supreme Court did in *Graham*. If this Court does so, it will find *Graham*'s reasoning fully applies here. Willbanks received consecutive sentences of 15 years for kidnapping, life imprisonment for assault, 20 years each for two robbery counts, and 100 years each for three associated armed criminal action counts, for an aggregate sentence of life plus 355 years. Under Missouri's rules governing parole, Willbanks would not become eligible for parole until age 85, which is at or beyond what the parties identify as his life expectancy of 79 years, and consequently he would not have a meaningful opportunity for release.[15] His sentence, therefore, is the functional equivalent of LWOP and so is invalid under *Graham*.

Second, the Sixth Circuit did not hold in *Bunch* that *Graham* does not apply to aggregate sentences that are the functional equivalent of LWOP. It simply said, as a federal court, it could not grant habeas corpus relief from an Ohio state court decision holding *Graham* does not apply to aggregate sentences because federal courts are prohibited by *federalism* principles (as set out in *Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989)*) and in the Antiterrorism and Expedited Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254(d), from reversing a state court decision unless the state court decision is "contrary to or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States."

But the Ohio Supreme Court's recent opinion shows the court did not feel bound or persuaded by the Sixth Circuit opinion in *Bunch*. *Moore, 149 Ohio St.3d 557, 76 N.E.3d 1127*. It concluded, contrary to *Bunch*, that *Graham* applies to term-of-years sentences that aggregate to close to or more than the juvenile offender's lifetime. One of the concurring opinions elaborates, explaining (as does this dissent) any limitation on federal courts overturning state decisions has no effect on the authority of *state* courts to do so. *Id. at 568–90, 76 N.E.3d 1127, 2016 WL 7448751 at *26-27* (O'Connor, C.J., concurring) (noting the federal standard is "so highly deferential to state courts, it is virtually impossible for a federal court sitting in habeas to give relief to a juvenile," but "[w]e who sit at the pinnacle of a state judiciary should be reluctant to adopt the limited standards of federal habeas jurisdiction as a proper proxy for the rigorous constitutional analysis that claims like Moore's deserve").

To the contrary, the Supreme Court specifically held in *Danforth v. Minnesota, 552 U.S. 264, 266, 128 S.Ct. 1029, 169 L.Ed.2d 859 (2008)*, that no similar principles "constrain[ ] the authority of state courts to give broader effect to new rules of criminal procedure than" federal courts.

---

**15.** Under Missouri's mandatory minimum prison term statute, section 558.019, an inmate convicted of a "dangerous felony" must serve either 85 percent of the sentence or until the age of 70 if he has served 40 percent of the sentence. For other felony convictions, the inmate must serve 50 percent of the term or until age 70 if he has served 40 percent of the sentence. For parole eligibility purposes, aggregate term-of-years sentences imposed consecutively for crimes committed "at or near the same time" that come to greater than 75 years are treated as 75 years. Life sentences are defined as 30 years. *§ 558.019, RSMo (Supp. 2013)*. Willbanks' convictions are all "dangerous felonies" except for the armed criminal action (ACA) charges. Although Willbanks may qualify under the geriatric release provision, Missouri Department of Corrections regulations require an additional 15 years mandatory time served on the ACA charges. *Mo. Code Regs. Ann. tit. 14 § 80-2.010(1)(E)*. The department of corrections agrees that Willbanks will not be eligible for release before the age of 85.

*Id. at 266, 128 S.Ct. 1029.*[16] This is because limitations on federal court authority are mandated by comity and federalism and so "are unique to *federal* habeas review of state convictions." *Id. at 279,* 128 S.Ct. 1029. Finality of convictions is a state, not a federal, interest. *Id. at 280,* 128 S.Ct. 1029.

As applied here, *Danforth* means, once the Supreme Court rules on the constitutional validity of aggregate sentences that are the functional equivalent of LWOP (and assuming its existing cases do not already effectively decide this issue, as the Ninth and Seventh circuits have held), state courts would have to be uniform in applying that ruling.[17] But, in the absence of such a direct ruling, no principle of federal or state law precludes this Court from reaching and determining whether the principles set out in *Graham, Miller, Montgomery,* and *Roper* apply to aggregate sentences that are the functional equivalent of LWOP. Indeed, as this Court previously has recognized, that is this Court's job. *State v. Whitfield, 107 S.W.3d 253, 266 (Mo. banc 2003); State ex rel. Amrine v. Roper, 102 S.W.3d 541, 546-47 (Mo. banc 2003).*

Finally, *Bunch* just was wrong in saying it is not clearly established that *Graham* applies to aggregate sentences simply because a few state court cases have found *Graham* does not apply to such sentences. That is like saying a clause is ambiguous if a few judges disagree as to its meaning—a proposition this Court has repeatedly rejected; the conclusion of ambiguity does not follow from honest disagreement. *Ethridge v. TierOne Bank, 226 S.W.3d 127, 131 (Mo. banc 2007).* Similarly, here, as the Tenth Circuit noted, what matters is what *Graham* itself said and whether its principles, in fact, do apply to aggregate sentences. *Budder* concluded, "in light of the clearly established federal law, the state court's judgment 'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement,'" that it had to "grant the petitioner's request for habeas relief." *Budder, 851 F.3d at 1052.*

In other words, that a small number of courts disagree as *to Graham'*s meaning does not make its otherwise clear principles ambiguous. Neither is the majority persuasive in attempting to ignore the super-majority of states resolving the issue (12 of 17) that have held *Graham* applicable to aggregate sentences by suggesting we have not yet heard from the other 33. Justice cannot wait for this Court to be the last to recognize an Eighth Amendment violation.

The majority's reticence to act is particularly inappropriate in light of the fact Ohio itself, to which *Bunch* said it had to defer, now recognizes *Graham* applies to aggregate sentence cases, and one of the only two other state court cases *Bunch* cited to support its belief that there was

---

16. Indeed, that was the very heart of its decision in *Danforth,* which involved whether Minnesota had the authority to retroactively apply the "new rule" for Confrontation Clause analysis announced by the Supreme Court in *Crawford v. Washington, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004),* when federal courts were barred from doing so under the narrow retroactivity principles set out in *Teague.*

17. For example, once *Montgomery* was decided, the Supreme Court enforced the now uniform rule by reversing state cases that had held *Miller* did *not* apply retroactively. *E.g., People v. Carp, 496 Mich. 440, 852 N.W.2d 801, 811 (2014), cert. granted, judgment vacated, — U.S. ——, 136 S.Ct. 1355, 194 L.Ed.2d 339 (2016); Ex parte Williams, 183 So.3d 220 (Ala. 2015), cert. granted, judgment vacated sub nom. Williams v. Alabama, — U.S. ——, 136 S.Ct. 1365, 194 L.Ed.2d 347 (2016).*

not yet a consensus as to *Graham*'s application to aggregate sentences has since itself been overruled.[18] *Moore, 149 Ohio St.3d at 591–93, 76 N.E.3d 1127, 2016 WL 7448751, at \*28-29* (O'Connor, C.J., concurring) (noting *Henry v. State, 82 So.3d 1084 (Fla. Ct. App. 2012)*, was pending when *Bunch* was decided but has since been quashed, unanimously, by the Florida Supreme Court in *Henry v. State, 175 So.3d 675 (Fla. 2015)*).[19]

Perhaps this is why, as discussed supra, the other three United States Court of Appeals circuits to have directly addressed the issue have held *Graham*'s principles *do apply* to aggregate sentences that are so long as to be the functional equivalent of LWOP. *See Moore, 725 F.3d at 1191; McKinley, 809 F.3d at 911-14.*

## II. THIS COURT HAS THE AUTHORITY TO APPLY THE REASONING OF GRAHAM TO NEW SITUATIONS TO WHICH ITS PRINCIPLES APPLY

Despite these holdings by three-fourths of the states to address the issue and by two out of three federal appellate courts, all invalidating sentences that are the functional equivalent of LWOP, the majority says "it is not for this Court to make that decision." Citing a *dissenting* opinion, the majority states that, because the Supreme Court has not yet decided an aggregate sentence case, it might get mad at this Court for applying *Graham* to one, stating:

> But the Supreme Court has not held that multiple fixed-term sentences totaling beyond a juvenile offender's life expectancy are the functional equivalent of life without parole. Warning of "frequent and disruptive reassessments of [the Supreme Court's] Eighth Amendment precedents," the Supreme Court has not looked positively upon lower courts issuing various rulings without precedence from the Supreme Court. *Roper*, 543 U.S. at 594, 125 S.Ct. 1183 (O'Connor, J., dissenting). "[C]lear, predictable, and uniform constitutional standards are especially desirable" in the area of the Eighth Amendment. *Id.* Extending Supreme Court holdings beyond the four corners of its opinion is similarly disfavored.

*Op. at 246* (footnote omitted). Respectfully, the majority's reasoning is just wrong for at least two reasons.

18. In fact, even the Sixth Circuit seems equivocal. In *Starks v. Easterling, 659 Fed.Appx. 277, 280 (6th Cir. 2016)*, the Sixth Circuit said that it believes *Graham* should be applied to aggregate sentences, and it was only because of its narrow reading of its authority as a federal court that it did not grant relief, stating:

> In our view, [*Roper, Graham, Miller*, and *Montgomery*] illustrate *the Court's growing unease with draconian sentences imposed upon juveniles, even for serious crimes. As this line of jurisprudence continues to evolve, it may well be that the Court one day holds that fixed term sentences for juvenile offenders that are the functional equivalent of life without parole are unconstitutional,* especially if the sentencing court has not taken the defendant's youth into consideration. *That said, it is not our role to predict future outcomes.* Because the Supreme Court has not yet *explicitly* held that the Eighth Amendment extends to juvenile sentences that are the functional equivalent of life, and given the fact that lower courts are divided about the scope of *Miller, we hold that the Tennessee courts' decisions were not contrary to, or an unreasonable application of, clearly established federal law as defined by the Supreme Court.*

> *Id.* (emphasis added).

19. As the Ohio Supreme Court observed, the other state appellate opinion *Bunch* relied on—*Kasic*—is inapposite because the sentence was imposed in part for crimes committed as an adult. *Moore, 149 Ohio St.3d at 591–92, 76 N.E.3d 1127, 2016 WL 7448751, at \*28* (O'Connor, C.J., concurring), *citing, State v. Kasic, 228 Ariz. 228, 265 P.3d 410, 413 (Ariz. App. 2011).*

First, and most basically, fear of censure should not stay this Court's hand from doing justice. That is this Court's ultimate responsibility as the highest arbiter of Missouri citizens' constitutional rights. Second, this Court's responsibility to do justice is not onerous here, for the majority's stated fear of censure is totally unjustified. The majority cites to Justice O'Connor's opinion in *Roper* as the basis for its fear of disapproval, but (as it acknowledges) Justice O'Connor wrote *in dissent*. While she castigated this Court for its holding in *Roper*, the majority of the Supreme Court certainly did not agree. Rather than censuring this Court, the *Roper* majority quoted this Court's reasoning twice in its decision. *Roper, 543 U.S. at 559-60, 566-67*, 125 S.Ct. 1183.[20] It found this Court's analysis, based on an application of the principles set out in *Atkins*, was sound and properly applied to the context of juvenile death sentences, even though *Atkins* itself did not involve a juvenile death sentence.

In other words, this Court did not show disrespect by deciding differently than the Supreme Court had in the earlier case cited by Justice O'Connor, for this Court simply held, reconsidered in light of *Atkins*, Supreme Court precedent called for a different result. All this Court did in *Roper* was what state courts do every

day—it applied existing principles of law to new situations.[21] And it was affirmed.

Indeed, were it "disfavored" to "extend" *Graham* (in reality, to apply it) to include aggregate sentences that do not allow for meaningful release, likely to bring down the Supreme Court's ire on this Court, then one would expect the Supreme Court would have granted certiorari in the Seventh or Ninth Circuit's decision in *McKinley* or *Moore*, or in the 12 state supreme court cases that have applied *Graham* or *Miller* in just this way. But it has let all of these decisions stand, for it is the job of state supreme courts to decide constitutional issues such as this by applying the reasoning of Supreme Court cases to new facts. Doing our job is not disfavored.

Similarly, were it disfavored to apply Supreme Court reasoning to new factual situations absent guidance from the Supreme Court as to how to do so—if this were an improper "extension" of Supreme Court law—one would have expected the Supreme Court to have taken certiorari in some of the many state supreme court decisions applying *Miller* retroactively to juvenile LWOP cases long before the Supreme Court held in *Montgomery* that the fundamental principles underlying *Miller* are substantive and must be applied retroactively to all juveniles.[22] *Montgomery, 136*

20. It cited to *State ex rel. Simmons v. Roper, 112 S.W.3d 397, 399 (Mo. banc 2003)*, for the point that a national consensus had emerged since *Stanford*, and for the point that it would be ironic to allow the execution of juvenile offenders when this national consensus likely developed earlier than the consensus leading to the prohibition on executing developmentally disabled offenders in *Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). Simmons, 112 S.W.3d at 408 n.10.*

21. *See also Roper, 543 U.S. at 629, 125 S.Ct. 1183 (Scalia, J., dissenting)* (criticizing adoption of "evolving standard of decency" approach because it invites state courts to strike

out on their own in deciding what had evolved, just as Missouri did in applying the principles from *Atkins* to juvenile offenders).

22. *See, e.g., Ragland, 836 N.W.2d at 114; Horsley v. State, 160 So.3d 393, 394 (Fla. 2015); Aiken v. Byars, 410 S.C. 534, 765 S.E.2d 572, 576 (2014), cert. denied, —— U.S. ——, 135 S.Ct. 2379, 192 L.Ed.2d 179 (2015); Diatchenko v. Dist. Attorney for Suffolk Dist., 466 Mass. 655, 1 N.E.3d 270, 278 (2013); People v. Davis, 379 Ill.Dec. 381, 6 N.E.3d 709, 721 (2014), cert. denied, —— U.S. ——, 135 S.Ct. 710, 190 L.Ed.2d 439 (2014); State v. Mantich, 287 Neb. 320, 842 N.W.2d 716, 730-31 (2014); Petition of State, 166 N.H. 659, 103 A.3d 227, 236 (2014),*

*S.Ct. at 727.* But, in so holding, *Montgomery* did not criticize the many state courts that already had applied *Miller* retroactively, even though they thereby applied *Miller'* s direct holding to a different situation. *Id.*[23]

Why? Because, for the reasons already noted, "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied." *Panetti v. Quarterman, 551 U.S. 930, 953, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007)* (internal quotation and citation omitted); *accord Moore, 725 F.3d at 1192.* Deciding such cases is part of our job description. It is just applying the law to new facts.

Indeed, *Danforth* further rejected the suggestion by the majority in the instant case that uniformity is so desirable that state courts should not act until the Supreme Court leads the way. *Danforth, 552 U.S. at 290, 128 S.Ct. 1029.* It specifically held there is no "general, undefined federal interest in uniformity," *id. at 280,* 128 S.Ct. 1029, and the limits imposed on federal courts by section 2254(a) in no way limit what state courts can do.[24]

*cert. denied sub nom. New Hampshire v. Soto, —— U.S. ——, 136 S.Ct. 1354, 194 L.Ed.2d 376 (2016); Jones v. State, 122 So.3d 698, 701-02 (Miss. 2013); State v. Mares, 335 P.3d 487, 508 (Wyo. 2014); Kelley v. Gordon, 2015 Ark. 277, 465 S.W.3d 842, 845 (2015), reh'g denied (Sept. 10, 2015), cert. denied, —— U.S. ——, 136 S.Ct. 1378, 194 L.Ed.2d 361 (2016)* ("However, while many states have chosen to do so, this court is not required to follow *Teague*.").

**23.** The point here is not that by denying certiorari the Supreme Court signaled it agreed with these courts, but rather that it did not find the decisions had to be reviewed because they were improperly failing to pay deference to Supreme Court precedent, as the majority inexplicably seems to fear will occur if this Court grants relief here. This Court can decide based on what it believes is the law,

## III.  GRAHAM *BARS AN AGGREGATE SENTENCE THAT DENIES A MEANINGFUL OPPORTUNITY FOR RELEASE*

### A.  *Categorical Approach Requires Consideration of Aggregate Sentences*

Here, as in *Graham,* the defendant claims the Eighth Amendment categorically bars juvenile offenders from receiving the type of sentence he received. Like the many state supreme courts discussed above, I would hold *Graham* requires, in assessing whether a particular type of sentence is barred because the offender was a juvenile, a categorical rather than a case-by-case approach must be utilized because such a "case implicates a particular type of sentence as it applies to an entire class of offenders who have committed a range of crimes." *Graham, 560 U.S. at 61, 130 S.Ct. 2011.* Use of this categorical approach requires this Court to recognize the characteristics that require treating juvenile non-homicide offenders differently do not change depending on whether the sentence is denominated LWOP or is an aggregate sentence:

> [N]one of what [*Graham*] said about children—about their distinctive (and

without worrying about whether the Supreme Court will think badly of it for doing so.

**24.** *Danforth* cited with approval "courts and commentators" who had opined that state courts may apply the Supreme Court's minimum constitutional requirements more broadly, *id. at 277 n.14, 128 S.Ct. 1029,* including L. Stith, *A Contrast of State and Federal Court Authority to Grant Habeas Relief,* 38 VAL. U.L.REV. 421, 443 (2004), which discussed Missouri cases applying habeas relief more broadly than do comparable federal courts. As that article notes, "While the underpinning of federal habeas review is to ensure that the states recognize and apply federal statutory and constitutional principles to cases tried in their courts, state courts are not so limited." *Id. at 448.*

transitory) mental traits and environmental vulnerabilities—is crime-specific. Those features are evident in the same way, and to the same degree, when . . . a botched robbery turns into a killing. So, *Graham*'s reasoning implicates any life without parole sentence imposed on a juvenile. . . .

*Miller, 132 S.Ct. at 2465.*

**B.** ***Penological Goals of Retribution, Deterrence, Incapacitation, and Rehabilitation Are Not Served by Aggregate Sentences That Are De Facto Life Without Parole***

The majority continues to use a sentence-by-sentence approach, perhaps because, like the majority in *State v. Nathan, SC95473, slip op., 522 S.W.3d 881, 2017 WL 2952773 (Mo. banc 2017)*, also handed down this date, it believes it would not serve the deterrent and retributive purpose of the criminal law to impose the same punishment for a single crime as for multiple crimes. It is wrong.[25]

First, *Graham* does not bar the imposition of aggregate sentences for multiple crimes; it simply bars making them of such length that the juvenile is given the functional equivalent of LWOP. Second, the juvenile is not required to be released at the time the juvenile is first eligible for parole; the juvenile simply must be considered for parole at that time, and the nature of the crimes is a relevant consideration. Of course, that consideration must be genuine. If the juvenile offender is determined to be irreparably corrupt, then he or she may not be granted parole. The Supreme Court requires, however, that the juvenile be given "meaningful opportunity

to obtain release based on demonstrated maturity and rehabilitation." *Graham, 560 U.S. at 75*, 130 S.Ct. 2011.

The opportunity is required because characteristics of juveniles mean they are less morally culpable and the normal legitimate penological goals of punishment—retribution, deterrence, incapacitation, and rehabilitation—do not justify the harshest of sentences in the case of juveniles. *Moore, 149 Ohio St.3d at 564–66, 76 N.E.3d 1127, 2016 WL 7448751, at \*7–8; Null, 836 N.W.2d at 63.* Their reduced culpability, the Supreme Court has said, stems from "three significant gaps between juveniles and adults:"

> First, children have a " 'lack of maturity and an underdeveloped sense of responsibility,' " leading to recklessness, impulsivity, and heedless risk-taking. *Roper, 543 U.S., at 569*, 125 S.Ct. 1183. Second, children "are more vulnerable . . . to negative influences and outside pressures," including from their family and peers; they have limited "contro[l] over their own environment" and lack the ability to extricate themselves from horrific, crime-producing settings. *Ibid.* And third, a child's character is not as "well formed" as an adult's; his traits are "less fixed" and his actions less likely to be "evidence of irretrievabl[e] deprav[ity]." *Id.*, at 570, 125 S.Ct. 1183.

*Miller, 132 S.Ct. at 2464* (alterations in original).

This reduced moral culpability means retribution is not properly served by the imposition of the harshest sentences: "Because the heart of the retribution rationale relates to an offender's blameworthiness,

---

**25.** Despite the following multipage discussion of how penological goals are furthered by treating juvenile sentences categorically and how the goals applicable to adults do not apply to juveniles, the majority criticizes this dissent for not adequately explaining why penological considerations are different for juveniles, although it is the majority that has failed to address the fact that this dissent simply applies the Supreme Court's own explanation in *Graham* and *Miller* of how those goals apply differently to juveniles.

the case for retribution is not as strong with a minor as with an adult." *Moore, 149 Ohio St.3d at 566, 76 N.E.3d 1127, 2016 WL 7448751, at \*8, quoting, Graham, 560 U.S. at 71, 130 S.Ct. 2011* (internal quotation and alterations omitted). *Moore* also notes that the Supreme Court has found LWOP sentences to be longer and thus harsher when imposed on juveniles: "A 16-year-old and a 75-year-old each sentenced to life without parole receive the same punishment in name only. \* \* \* This reality cannot be ignored." *Moore, 149 Ohio St.3d at 567, 76 N.E.3d 1127, 2016 WL 7448751, at \*9, citing, Graham, 560 U.S. at 70-71, 130 S.Ct. 2011* (alteration in *Moore*).

The characteristics of juveniles also make them less susceptible to deterrence. According to *Roper*, "the same characteristics that render juveniles less culpable than adults suggest as well that juveniles will be less susceptible to deterrence." *Roper, 543 U.S. at 571, 125 S.Ct. 1183.* Owing to their "lack of maturity and underdeveloped sense of responsibility," juveniles are "less likely to take a possible punishment into consideration when making decisions." *Graham, 560. U.S. at 72, 130 S.Ct. 2011.* The Supreme Court considers the likelihood juveniles weigh such consequences of their acts to be "virtually nonexistent." *Roper, 543 U.S. at 572, 125 S.Ct. 1183.*

A juvenile's capacity for change also means the legitimate concern for incapacitation does not justify LWOP. "To justify life without parole on the assumption that the juvenile offender forever will be a danger to society requires the sentencer to make a judgment that the juvenile is incorrigible." *Graham, 560 U.S. at 72, 130 S.Ct. 2011.* Even when the juvenile has committed a homicide, LWOP is only justified in the rare case when it can be determined at the outset that the juvenile is irreparably corrupt. *Miller, 132 S.Ct. at 2469* ("That is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.") (internal quotations omitted).

Similarly, a juvenile's capacity for change is why a sentence of LWOP thwarts the goal of rehabilitation. This is central to *Graham*:

> Life in prison without the possibility of parole gives no chance for fulfillment outside prison walls, no chance for reconciliation with society, no hope. Maturity can lead to that considered reflection which is the foundation for remorse, renewal, and rehabilitation. A young person who knows that he or she has no chance to leave prison before life's end has little incentive to become a responsible individual.

*Graham, 560 U.S. at 79, 130 S.Ct. 2011.* Indeed, the penological goal of rehabilitation "forms the basis of parole systems." *Id. at 73, 130 S.Ct. 2011.*

As in *Graham*, so too here, the Eighth Amendment is violated and *Graham* requires the juvenile be resentenced or be granted reasonable parole consideration.

### C. Remedy

Finally, the majority says it is hesitant to apply *Graham* to aggregate sentence cases because it will be difficult to draw an exact line in each case indicating when an aggregate sentence does not provide a meaningful opportunity for release. But difficulties in fashioning remedies have never stayed this Court's hand from doing justice. They should not do so here.[26]

---

**26.** To the extent a concern was raised at oral argument that drawing any line is arbitrary, it

Whatever age is appropriate, we know it must be some age short of the juvenile offender's death, and here Willbanks was sentenced to 355 years and will not be eligible for parole until a date that exceeds his life expectancy. Whatever amount of time constitutes "a meaningful opportunity for release," it is more than zero.

In any event, this Court does not need to set a specific age by which Willbanks or any other juvenile offender must have a parole hearing, or specify the hearing must be held within a certain time period before the end of the inmate's life expectancy. As other state supreme courts have noted, the legislature is free to make a legislative determination of how much is too much, by setting a particular point at which parole consideration must be made available.[27]

This reasoning applies equally to Missouri. This year, the Missouri legislature adopted what is now codified at section 558.047. That statute was adopted by the legislature in response to *Graham*, *Miller*, and this Court's decisions holding the legislature cannot sentence a juvenile homicide defendant to LWOP. *See State v. Hart, 404 S.W.3d 232 (Mo. banc 2013); see Order (Mo. banc Mar. 15, 2016)* (granting

juveniles unconstitutionally sentenced to LWOP as per *Miller* and *Montgomery* the possibility of parole after 25 years).

This Court withdrew that order once section 558.047 was adopted, for the statute provided a remedy that would apply to all cases. It provides that juvenile offenders sentenced to LWOP prior to August 28, 2016, and juvenile offenders sentenced after that date to life with parole or a term of 30 to 40 years may petition for a parole hearing after serving 25 years. *§ 558.047.1.* It further provides the parole hearing must consider factors evidencing rehabilitation since being incarcerated as well as the *Miller* factors associated with the youth of the offender at the time of the offense. *§ 558.047.5, incorporating by reference § 565.033.* This statute provides a legislative definition of when a sentence becomes equivalent to LWOP unless consideration for parole is granted.

Just as in other states, and just as this Court did for the 81 habeas petitioners who asked this Court to apply *Miller* to their sentences, this time standard should apply here in the absence of a different specific statutory rule or specific contrary direction from the Supreme Court. To be

---

is also unavoidable, so that such line drawing has not been an obstacle to the Supreme Court's recognition of categorical rules. For example, a "juvenile" for purposes of the *Graham* category is a person who is younger than 18 years at the time of the offense, even though no one believes there is a light-switch transformation to maturity, judgment, impulse control, ability to resist peer pressure, ability to think through consequences, etc., that happens overnight on the eve of the 18th birthday. As for the line-drawing in *Atkins*, the Supreme Court has largely left the matter to the states, *Atkins, 536 U.S. at 317,* 122 S.Ct. 2242, but with some subsequent oversight, *Hall v. Florida, — U.S. —, 134 S.Ct. 1986, 1993, 188 L.Ed.2d 1007 (2014).*

**27.** *Caballero, 145 Cal.Rptr.3d 286, 282 P.3d at 296 n.5* (calling on the legislature "to enact

legislation establishing a parole eligibility mechanism that provides a defendant serving a de facto life sentence without possibility of parole for nonhomicide crimes that he or she committed as a juvenile with the opportunity to obtain release on a showing of rehabilitation and maturity"); *Brown, 1 N.E.3d at 270 n.11* (leaving to the legislature to establish "the specific contours" of constitutional juvenile sentencing and admonishing it to take into account the functional effect of sentences including aggregate sentences); *State ex rel. Morgan v. State, 217 So.3d 266, 275-76 (La. 2016)* (holding the court must defer to the legislative intent in its "*Miller* fix" statute to punish "intent to kill" armed robbery as a nonhomicide crime and providing parole eligibility after 30 years).

clear, this remedy is offered not to suggest this Court should hold the statute applies directly, as the majority appears to interpret this dissent to argue, but rather because the statute sets out what the legislature has defined as a meaningful opportunity for release. This is the approach taken by this Court in a very similar situation in *Johnson v. State, 102 S.W.3d 535 (Mo. banc 2003)*. After Johnson had committed his crime, Missouri adopted section 565.030, RSMo Supp. 2013, which provides persons meeting the definition of mental retardation (since amended to substitute the term "mental disability") shall receive a life sentence rather than the death penalty for murders committed after August 28, 2001. Not long thereafter, the Supreme Court held in *Atkins* that it constitutes cruel and unusual punishment to impose the death penalty on a person who is "mentally retarded." *Johnson, 102 S.W.3d at 539*. Although this Court recognized section 565.030.6 did not directly apply to Johnson's pre-2001 homicide offense, it held:

> Nonetheless, in light of *Atkins*, this Court holds as a bright-line test that a defendant that can prove mental retardation by a preponderance of the evidence, as set out in section 565.030.6, shall not be subject to the death penalty.

*Id.*

This Court should treat section 558.047 the same way. While section 558.047 directly applies to LWOP cases, its constitutional foundation in *Graham's* principles means it should be used as a bright line rule to be applied as well to sentences that are the functional equivalent of LWOP.

## IV. CONCLUSION

This Court has the authority to apply the principles underlying *Graham* and *Miller* to aggregate sentences. Those principles at their base require that all nonhomicide juvenile offenders are entitled to a meaningful opportunity for release. Aggregate sentences that are the functional equivalent of LWOP fail to provide such a meaningful opportunity for release. Willbanks is a nonhomicide juvenile offender. The aggregate sentence he received would not make him eligible for parole consideration until age 85. That is beyond his life expectancy, beyond an age that would allow him a meaningful opportunity for release, and well beyond the time when Missouri's legislature has determined that even homicide juvenile offenders are entitled to parole consideration. The sentence violates his Eighth Amendment right to be free from cruel and unusual punishment. I would, therefore, reverse Willbanks' conviction and remand for resentencing in accordance with the time standards set out in section 558.047.